[Nos. 63919-6-I; 63982-0-I. Division One. May 16, 2011.]

*In the Matter of the Parentage and Custody of* A.F.J.

MARY FRANKLIN, *Appellant*, v. JACKIE JOHNSTON, *Respondent.*

*Mary Franklin*, pro se.

*Dennis J. McGlothin* and *Robert J. Cadranell II* (of *Olympic Law Group PLLP*) and *Carol J. Ellerby* (of *Public Defenders Association*), for respondent.

*H. Michael Finesilver, Jonathan M. Weiss,* and *Peter S. Lineberger* on behalf of American Academy of Matrimonial Lawyers, amicus curiae.

*Robert M. McKenna, Attorney General, Trisha L. McArdle, Managing Assistant,* and *Sheila M. Huber* and *Carrie H. Wayno, Assistants,* on behalf of Department of Social and Health Services, amicus curiae.

*David J. Ward* on behalf of Legal Voice, amicus curiae.

*Ruth L. Edlund* on behalf of the Family Law Section of the Washington State Bar Association, amicus curiae.

¶1 DWYER, C.J. — This case concerns the interplay between foster parenting and the common law de facto parentage doctrine. Jackie Johnston, the biological mother of a newborn, encouraged Mary Franklin, Johnston's intimate partner, to develop a parent-like relationship with the child. Subsequently, the State initiated a dependency proceeding on the child's behalf and Franklin became the child's foster parent. Finding both that the de facto parentage doctrine is applicable in these circumstances and that the five-part test announced by our Supreme Court is met in this case, we affirm the trial court's determination that Franklin is the child's de facto parent.[1]

I

¶2 The facts are these.[2] Mary Franklin, born in 1959, and Jackie Johnston, born in 1966, began dating in 2002. During the course of their relationship, Johnston became

---

[1] The parties' remaining assignments of error are addressed in the unpublished portion of this opinion. Finding no error, we affirm the trial court's orders in all respects.

[2] In her cross appeal, Johnston assigns error to several of the trial court's findings of fact. Generally, findings of fact "are viewed as verities, provided there is substantial evidence to support the findings." *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). "Substantial evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding." *Hill*, 123 Wn.2d at 644.

The trial record provided to us is incomplete. We have been provided with none of the exhibits admitted at trial. Moreover, we have not been provided with a record of the testimony of numerous witnesses. In such a situation, our ability to fairly evaluate the findings in light of the record before the trial court is compromised. Thus, we treat the findings as verities. *See Happy Bunch, LLC v. Grandview N., LLC*, 142 Wn. App. 81, 90, 173 P.3d 959 (2007); *St. Hilaire v. Food Servs. of Am., Inc.*, 82 Wn. App. 343, 351-52, 917 P.2d 1114 (1996); *Rekhi v. Olason*, 28 Wn. App. 751, 753, 626 P.2d 513 (1981); *Gaupholm v. Aurora Office Bldgs., Inc.*, 2 Wn. App. 256, 257, 467 P.2d 628 (1970). This approach to appellate review of trial court factual determinations is one of long standing. *See Apostle v. Lillions*, 8 Wn.2d 118, 121, 111 P.2d 789 (1941); *Deller v. Long*, 96 Wash. 372, 373, 165 P. 98 (1917).

addicted to crack cocaine. As a result of Johnston's addiction, the couple's relationship was difficult and sporadic. At Franklin's insistence, Johnston entered treatment programs on several occasions. None were successfully completed. The women's relationship was made more difficult because Franklin lived in Washington while Johnston lived in California.

¶3 In early 2005, during a period when the couple was separated, Johnston relapsed and became pregnant with A.F.J. Johnston reached out to Franklin for help and moved to Washington. Shortly after Johnston and Franklin reunited, Franklin learned that Johnston was pregnant. Franklin assisted Johnston in obtaining prenatal care and drug addiction treatment. During the course of the pregnancy, when Johnston was not in treatment, she lived primarily with Franklin.

¶4 In October 2005, Johnston, still pregnant, relapsed again. Johnston was then admitted into the Perinatal Treatment Services (PTS) facility in Tacoma, where she remained until after A.F.J.'s birth. A.F.J. was born on November 20, 2005. His full given name includes the surnames of both Franklin and Johnston.

¶5 Johnston and A.F.J. resided at PTS until late December, although Franklin took A.F.J. home with her on occasion. Johnston later reported that because PTS would not allow Franklin to take A.F.J. home with her more frequently, she left PTS earlier than recommended.

¶6 Upon leaving PTS, Johnston rented an apartment for the month of January. However, she used the apartment for only a short time. Instead, Johnston and A.F.J. stayed with Franklin over the December holidays and lived with Franklin for most of the month of January. Franklin and Johnston together attended A.F.J.'s doctor appointments. Franklin participated in the decision to have A.F.J. circumcised.

¶7 At the end of January, about one month after leaving PTS, Johnston had a severe relapse. Franklin, concerned

about the welfare of A.F.J. and Johnston, called Child Protective Services. A.F.J. was removed from the home. He was, however, returned to Franklin's care several days later. The State initiated a dependency action on A.F.J.'s behalf.

¶8 In April 2006, the trial court required Franklin to become licensed as a foster parent in order to maintain care of A.F.J. Franklin procured the requisite license, becoming A.F.J.'s foster mother in September 2006. She cared for A.F.J. throughout the licensing process.

¶9 Franklin accepted foster care payments from September 2006 through April 2008. After April 2008, the foster care payments ceased; however, they were resumed in February 2009. Franklin did not deposit any of the checks sent to her after April 2008.

¶10 The State filed a termination petition against both Johnston and A.F.J.'s unknown biological father, who did not respond to the petition. His rights were terminated by default.

¶11 Franklin then filed petitions requesting either nonparental custody of A.F.J. or the establishment of de facto parentage. The nonparental custody, de facto parentage, and dependency proceedings were linked and accepted into the Unified Family Court. Subsequently, the termination proceeding was continued pending the resolution of Franklin's nonparental custody and de facto parentage actions.

¶12 A trial was then held on the nonparental custody and de facto parentage actions. In April 2009, at the conclusion of trial, the court made numerous oral findings and rulings. In May 2009, the trial court entered several written orders consistent with the court's prior rulings. The trial court entered findings of fact and conclusions of law regarding nonparental custody and de facto parentage, wherein the trial court found that Johnston was a fit mother. The trial court concluded that Franklin did not prove either that Johnston was an unfit mother or that it would be to A.F.J.'s detriment to be placed in Johnston's

custody, and, as a result, there was no basis to grant nonparental custody to Franklin. The trial court also concluded that Franklin had demonstrated that she was A.F.J.'s de facto parent.

¶13 The trial court ordered a temporary parenting plan that provided for the parties to equally share residential time and to engage in joint decision-making. Johnston was named the default decision-maker in the event that they were unable to make joint decisions. The trial court also ordered Franklin to pay $215 per month in child support to Johnston, granting a deviation from the child support schedule based on the parties' equal residential arrangement. In addition, the trial court awarded $20,000 in attorney fees to Johnston.

¶14 Franklin appeals, raising issues regarding the award of attorney fees, the order of child support, and the parenting plan. Johnston cross appeals, contending that Franklin cannot be A.F.J.'s de facto parent.

## II

¶15 We first consider the decisive issue in this case. Johnston contends on cross appeal that the trial court erred by finding that Franklin, A.F.J.'s foster mother, was A.F.J.'s de facto parent. We disagree.[3]

¶16 Our Supreme Court first recognized the de facto parentage doctrine in *In re Parentage of L.B.*, 155 Wn.2d 679, 122 P.3d 161 (2005). There, the court examined whether a biological mother's former lesbian partner, who was neither biologically related to the child nor an adoptive parent of the child, had standing to petition "for a determination of coparentage" of the child. *L.B.*, 155 Wn.2d at 683-84, 688-89. The two women at issue therein were in a

---

[3] At our request, the Department of Social and Health Services, Legal Voice, and the American Academy of Matrimonial Lawyers submitted amici curiae briefs. The excellent briefing submitted by amici was helpful to our analysis of this important issue, and the court is grateful for the professionalism displayed by amici's counsel.

long-term committed relationship when the child was born, the decision to add the child to the relationship was a joint decision, the women held themselves and the child out to the public as a family, and the women coparented the child until their relationship ended when the child was six years old. *L.B.*, 155 Wn.2d at 683-84.

¶17 After their relationship ended, the biological mother terminated all contact between her former partner and the child. The former partner petitioned for establishment of parentage, asking that she be declared the child's legal parent pursuant to the Uniform Parentage Act (UPA), chapter 26.26 RCW; that she be declared a parent pursuant to equitable estoppel principles or recognized as a de facto parent; or that she be allowed statutory third party visitation rights. *L.B.*, 155 Wn.2d at 685.

¶18 Relying on its equitable powers and recognizing the common law status of a de facto parent, our Supreme Court determined that the former partner had standing to petition "for a determination of coparentage" if she could establish that she had a de facto parent relationship with the child. *L.B.*, 155 Wn.2d at 683. The court announced a common law remedy recognizing that "while attempting to give structure and predictability to [parentage] determinations, neither the UPA nor corresponding statutes defining parental rights and responsibilities purport to preclude the operation of the common law when addressing situations left unanswered after conducting a strict statutory inquiry." *L.B.*, 155 Wn.2d at 696. While the "UPA undeniably provides a statutory, and the most common, avenue by which courts adjudicate a person a parent in this state[,] . . . it inevitably did not contemplate nor address every conceivable family constellation." *L.B.*, 155 Wn.2d at 688 n.5. Thus, the de facto parentage doctrine was needed "to fill the interstices that our current legislative enactment fails to cover in a manner consistent with our laws and stated legislative policy." *L.B.*, 155 Wn.2d at 707. The court explained that until the time that the legislature chooses to act, it is the duty of the court to " 'endeavor to administer

justice according to the promptings of reason and common sense.' " *L.B.*, 155 Wn.2d at 707 (quoting *Bernot v. Morrison*, 81 Wash. 538, 544, 143 P. 104 (1914)).

¶19 The court then set forth the elements that a party claiming de facto parent status must establish: (1) the natural or legal parent consented to and fostered the parent-like relationship; (2) the petitioner and the child lived together in the same household; (3) the petitioner assumed obligations of parenthood without expectation of financial compensation; (4) the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship, parental in nature; and (5) the petitioner has fully and completely undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life. *L.B.*, 155 Wn.2d at 708. The court held that

> a *de facto* parent stands in legal parity with an otherwise legal parent, whether biological, adoptive, or otherwise. As such, recognition of a person as a child's *de facto* parent necessarily "authorizes [a] court to consider an award of parental rights and responsibilities . . . based on its determination of the best interest of the child." A *de facto* parent is not entitled to any parental privileges, as a matter of right, but only as is determined to be in the best interests of the child at the center of any such dispute.

*L.B.*, 155 Wn.2d at 708-09 (alterations in original) (footnote and citations omitted) (quoting *C.E.W. v. D.E.W.*, 2004 ME 43, 845 A.2d 1146, 1152)).

¶20 Subsequently, our Supreme Court held that the de facto parentage cause of action is unavailable in the step-parent-stepchild context. *In re Parentage of M.F.*, 168 Wn.2d 528, 532, 228 P.3d 1270 (2010). Before M.F. was two years old, her natural parents divorced and her mother married John Corbin. *M.F.*, 168 Wn.2d at 529-30. Several years later, her mother and Corbin divorced, but Corbin continued to have regular contact with M.F. until she was 12. *M.F.*, 168

Wn.2d at 530. Corbin subsequently petitioned to be recognized as M.F.'s de facto father.[4] *M.F.*, 168 Wn.2d at 530.

¶21 In denying Corbin's request, the Supreme Court explained that "the factors prompting us to recognize a remedy in *L.B.* are not present in this case, as no statutory gaps exist to fill." *M.F.*, 168 Wn.2d at 532. Rather, the court reasoned, "[a]n avenue already exists for a stepparent seeking a legal, custodial relationship with a child. The legislature has created and refined a statutory scheme by which a stepparent may obtain custody of a stepchild." *M.F.*, 168 Wn.2d at 532. The court noted that

> [t]he statutory void confronting us in *L.B.* is absent here. As did the parties in *L.B.*, [M.F.'s natural parents] chose to have children and form a family. But unlike in *L.B.*, [the natural parents'] status as legal parents was established at the outset. In contrast, Corbin entered M.F.'s life as a stepparent, a third party to M.F.'s two existing parents.

*M.F.*, 168 Wn.2d at 532. The court determined that chapter 26.10 RCW, the third party custody statute, provided an adequate statutory remedy for Corbin. The court held that the "intertwined judicial and statutory history [of third party custody actions] illustrates the legislature's ongoing intent to create laws accommodating stepparents who seek custody on or following dissolution. Though our statutory scheme does not permit a stepparent to petition for parental status, this does not equate to a lack of remedy." *M.F.*, 168 Wn.2d at 533.

¶22 Because no statutory void exists with respect to stepparent-stepchild relationships, the court determined that it "cannot apply an equitable remedy that infringes upon the rights and duties of M.F.'s existing parents." *M.F.*, 168 Wn.2d at 532. The court emphasized that in addition to the existence of a statutory remedy, its decision was based on the fact that the court was "faced with the competing

---

[4] Corbin petitioned to become M.F.'s de facto father after M.F. arrived at Corbin's house "bruised in intimate places, apparently from being 'tickled' by her mother's new boyfriend." *M.F.*, 168 Wn.2d at 536 (Chambers, J., dissenting).

interests of parents—with established parental rights and duties—and a stepparent, a third-party who has no parental rights." *M.F.*, 168 Wn.2d at 532. The court concluded:

[H]ere, the petitioner is a third-party to the two already existing parents, which places him in a very different position than the respondent in *L.B.* These differences, as well as the presence of a statutory remedy available to Corbin, support our conclusion that the de facto parentage doctrine should not extend to the circumstances in this case.

*M.F.*, 168 Wn.2d at 534.

¶23 Turning to the issues presented herein, "the correct starting point is not whether the de facto parent test has been met" but, rather, whether that test is applicable here; the de facto parentage test is relevant only if we first decide "that the de facto parentage doctrine applies to the circumstances presented in this case." *M.F.*, 168 Wn.2d at 534. Thus, only if we first determine that the de facto parentage doctrine is available in a situation such as this must we then turn to the question of whether Franklin's proof satisfies the de facto parentage test.

¶24 Johnston contends that the de facto parentage doctrine cannot be applied to the circumstances of this case for two reasons, one general and the other specific to this case. First, Johnston contends that foster parents may never qualify as de facto parents and, thus, Franklin cannot be A.F.J.'s de facto parent. Second, Johnston contends that there were statutory remedies available to Franklin, thus precluding application of the de facto parentage doctrine. We find neither contention persuasive.

¶25 We begin by addressing Johnston's assertion that a foster parent can *never* qualify as a de facto parent.[5] Johnston contends that two Washington decisions categorically exclude foster parents from qualifying as de facto

---

[5] This question is distinct from the question of whether the period of time that a person was a foster parent can be considered in determining whether the elements of the de facto parentage test are satisfied. We address that question later in this opinion.

parents. *See In re Custody of A.C.*, 137 Wn. App. 245, 153 P.3d 203 (2007), *rev'd on other grounds*, 165 Wn.2d 568, 200 P.3d 689 (2009); *Blackwell v. Dep't of Soc. & Health Servs.*, 131 Wn. App. 372, 127 P.3d 752 (2006).

¶26 In *A.C.*, a nonparental custody action, the trial court awarded custody of a young boy to his foster parents rather than to his mother. 137 Wn. App. at 253. The foster parents had not known A.C. prior to the State's removing him from his mother's care; instead, they met A.C. only as a result of traditional foster care placement. *A.C.*, 137 Wn. App. at 250. In addressing the effect of the trial court's determination that the foster parents were A.C.'s " 'psychological parents,' " the Court of Appeals noted that the mother "never consented to [the foster parents'] custody of A.C. Consequently, [the foster parents] cannot use the status of psychological parents to interfere with [the mother's] constitutionally protected rights." *A.C.*, 137 Wn. App. at 261 (citing *In re Custody of Shields*, 157 Wn.2d 126, 146, 136 P.3d 117 (2006)).

¶27 The circumstances in *Blackwell* were quite different. In that case, the Blackwells were foster parents who were investigated for child abuse and who had their foster care license revoked. *Blackwell*, 131 Wn. App. at 374. They subsequently brought a tort claim against the State alleging negligent investigation, a cause of action afforded only to children and parents. *Blackwell*, 131 Wn. App. at 375. The Blackwells argued that the court should "extend the duty [and, thus, the cause of action] to foster parents, especially those who claim to be de facto or psychological parents." *Blackwell*, 131 Wn. App. at 376. We held that the foster parents could not satisfy the elements of the de facto parentage test:

> The record before us demonstrates that the Blackwells only meet the second part of the test. Certainly parts one and three are not established. The Blackwells are not the natural or legal parents of D.R. and they were paid to serve as foster parents. In addition, the record before the court does not support a holding that an actual bond developed between D.R. and the Blackwells, given D.R.'s desire to leave the Blackwell home.

*Blackwell*, 131 Wn. App. at 378.

¶28 *Blackwell* does not support Johnston's contention that *all* individuals who serve as foster parents are categorically excluded from being de facto parents. Otherwise, we would not have found it necessary to determine whether the Blackwells could satisfy the elements of the de facto parentage test. Nor does *A.C.* support Johnston's contention, given that the court determined that the child's mother had not consented to the relationship; as such, the five-part de facto parentage test could not be met. *See L.B.*, 155 Wn.2d at 708 (part one). Indeed, none of the cases cited by Johnston indicate that foster parents are necessarily unable to satisfy the elements of *L.B.*'s five-part test. We can discern no reason to categorically exclude those individuals serving as foster parents from seeking de facto parent status. To the contrary, our decisions indicate that each determination of de facto parentage should be made based on the particular facts of each case, rather than by applying sweeping, categorical rules. As an equitable remedy, such a question is properly left to a case-specific inquiry.

¶29 Nevertheless, amicus Department of Social and Health Services (DSHS) opines that as a general matter, allowing foster parents to be recognized as de facto parents "undermines the dependency process and contravenes legislative intent to maintain the family unit." Amicus DSHS Br. at 18. Foster parents generally have neither a right to intervene in dependency proceedings nor a very high likelihood of being granted permissive intervention in such proceedings because "a foster parent's adversarial participation in a dependency hearing has a tendency to shift the focus of the proceeding from the ability of the natural parent to care for the child to a comparison of the natural parent to the foster parent." *In re Welfare of Coverdell*, 39 Wn. App. 887, 890-91, 696 P.2d 1241 (1984). Similarly, the American Law Institute has cautioned, "Relationships with foster parents are . . . generally excluded . . . because inclusion of foster parents would undermine the integrity of

a state-run system designed to provide temporary, rather than indefinite, care for children." AM. LAW INST., PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION: ANALYSIS & RECOMMENDATIONS § 2.03 cmt. (c)(ii), at 120 (2003).

¶30 DSHS's concerns are legitimate. However, such concerns do not arise in a situation such as this, where a parent-child relationship between the individual seeking de facto parent status and the child *preexisted* the fostering relationship. In fact, the American Law Institute, after noting the above-stated reservations, nevertheless observes that an individual who served in a parental role to a child prior to becoming a foster parent to that child would likely qualify as a de facto parent. AM. LAW INST., *supra*, § 2.03 cmt. (c)(ii), illus. 21, at 121. The policy concerns raised by DSHS are not implicated where, as here, the parent-child relationship was nurtured prior to any fostering relationship. These policy concerns being inapplicable in this case, we need not further consider them.

 ¶31 We next turn to Johnston's contention that the de facto parentage doctrine was inapplicable here because statutory remedies were available to Franklin. Johnston argues that Franklin could have become A.F.J.'s legal custodian through a nonparental custody action or could have adopted A.F.J. and, thus, that Franklin cannot avail herself of the remedy provided by the de facto parentage doctrine. Indeed, where statutory remedies are available, the common law de facto parentage doctrine cannot be employed. *M.F.*, 168 Wn.2d at 532-33. Our Supreme Court has determined that such remedies constitute suitable alternatives to de facto parent status in the stepparent context, where the child already has two legal parents. *M.F.*, 168 Wn.2d at 532-33.

¶32 Contrary to Johnston's contention, however, no statutory remedies were available to Franklin. As with the petitioner in *L.B.*, Franklin could not have successfully sought parental status pursuant to the UPA because she and Johnston were engaged in a same-sex relationship that is not contemplated by the UPA. 155 Wn.2d at 688 n.5. In

addition, as the trial court herein found, adoption was not an available remedy because Franklin could not have reasonably sought to complete an adoption in the mere two months between A.F.J.'s birth and the State's initiation of the dependency action.[6] Moreover, Franklin attempted to obtain custody of A.F.J. through a nonparental custody action, but she was unsuccessful because the trial court found that Johnston was a fit parent.[7] As with the petitioner in *L.B.*, Franklin has no statutory remedy whereby she can attempt to have her relationship *with a child whom she has raised since birth* legally recognized. Because a statutory gap exists in this case, the de facto parentage doctrine can be applied to the circumstances herein.

## III

¶33 Before applying the five-part test to the facts herein, however, we must determine whether the period of time during which an individual is serving as a foster parent may be considered for purposes of the de facto parentage test. Johnston contends that the period of time that the fostering relationship existed must be excluded from consideration. In support of her contention, she cites as persuasive authority a recent decision of the Alaska Supreme Court, wherein the court held that the trial court had properly excluded the time that the petitioner was a foster parent when analyzing whether the petitioner was the child's psychological parent. *Osterkamp v. Stiles*, 235 P.3d 178, 187 (Alaska 2010).

---

[6] Franklin was prepared to adopt A.F.J. had Johnston's parental rights been terminated.

[7] Resort to the nonparental custody statute, chapter 26.10 RCW, is available to any person. As such, it was available to the petitioner in *L.B.* There is no indication that the petitioner in *L.B.* made any effort to proceed under that statute, but the potential availability of such a remedy was not a bar to her petition for de facto parent status. *See* 155 Wn.2d at 712 (remanding to the trial court for a determination of whether the petitioner meets the five-part test). The facts of this case provide an even more compelling basis to find that the nonparental custody statute does not provide an adequate remedy, given that this remedy was expressly disallowed by the trial court.

¶34 In that case, the female foster parent of a child, Simon, chose to adopt him while her male domestic partner, Osterkamp, declined to adopt him. *Osterkamp*, 235 P.3d at 181-82. Osterkamp later sought partial custody of Simon on the basis that he was Simon's psychological parent. The Alaska Supreme Court reasoned that the time served as a foster parent may not be considered for purposes of establishing psychological parent status because

[a] foster parent serves a vital but inherently temporary role in a child's life. The ultimate goal in foster care is for the child to either be returned to the biological parents in appropriate circumstances or adopted, either by the foster parents or by another third party. The temporary nature of foster care along with the compensation for services associated with it make it more difficult to ascertain whether a foster parent has become a psychological parent or is serving the child's needs in a different capacity.

*Osterkamp*, 235 P.3d at 187. Moreover, Simon had been adopted by the female foster parent and "[t]he purpose of an adoption decree is to vest all legal parental rights with the adoptive parent or parents, to the exclusion of all others." *Osterkamp*, 235 P.3d at 187.

¶35 The reasoning in *Osterkamp* is unpersuasive as applied to the circumstances presented herein, where the parent-child relationship between Franklin and A.F.J. was initiated and encouraged by Johnston before and beyond the fostering relationship itself and where there is evidence that the relationship between Franklin and A.F.J. was, at its inception, intended to be permanent rather than temporary. *Osterkamp* notwithstanding, Johnston offers no reason that persuades us to mandate that the period of time during which Franklin was A.F.J.'s foster mother be ignored when analyzing whether Franklin's proof satisfies the five-part test. To be sure, we decline to hold that the time period during which an individual seeking de facto parent status served as a foster parent must *always* be considered in evaluating the five-part test. Rather, we are persuaded that this time period may be considered where the circum-

stances of the case warrant such consideration, as is the case herein. This holding does not compel a trial court to find that any particular component of the *L.B.* test is met but, rather, allows the court to consider all relevant circumstances in determining whether an individual's proof satisfies the de facto parentage test.

## IV

¶36 We now turn to the question of whether the evidence of Franklin's relationship with A.F.J. satisfies the five-part de facto parentage test.

¶37 The first part of the five-part test, that the natural or legal parent consented to and fostered the parent-like relationship, is met. Johnston had a romantic relationship with Franklin, notwithstanding that this relationship was unstable due to Johnston's drug addiction. Johnston renewed her relationship with Franklin upon learning that she was pregnant. Johnston testified that before A.F.J. was born, she had continued reaching out to Franklin because she was "nine months pregnant, and . . . wanted [Franklin] to be there." Report of Proceedings (Mar. 30, 2009) at 64. Franklin obtained prenatal care and drug addiction treatment for Johnston in order to ensure the child's well-being. Once A.F.J. was born, Franklin took him home from PTS as frequently as she was allowed; indeed, Johnston testified that she had left PTS earlier than recommended because the facility would not allow Franklin to take A.F.J. more often. Johnston and Franklin resided together with A.F.J. after Johnston left PTS. Johnston testified that Franklin was coparenting A.F.J. before the State intervened. As the trial court found, Johnston requested that Franklin be involved in naming A.F.J., and Franklin participated in the decision to circumcise him. When A.F.J. was removed from Johnston's custody, Johnston requested that A.F.J. be placed with Franklin. At this time, he was only two months old. Johnston continued supporting Franklin's relationship with A.F.J. even after the State became involved, in part

because she believed that she and Franklin would stay together. Both before and after the State's involvement and Franklin's status as a foster parent, Johnston encouraged and fostered Franklin's parental role in A.F.J.'s life.

¶38 The second part of the test, that the petitioner and the child lived together in the same household, is likewise satisfied. Johnston and A.F.J. lived predominantly with Franklin after Johnston left PTS, prior to the State's taking custody of A.F.J. Moreover, after the State filed the dependency action, A.F.J. continued to reside with Franklin, a circumstance that Johnston supported. Franklin did not become A.F.J.'s foster mother until almost eight months after the State intervened, and then only at the urging of the court. As the trial court found, A.F.J. has lived with Franklin for 99 percent of his life.

¶39 The third part of the test, that the petitioner assumed the obligations of parenthood without expectation of financial compensation, is also satisfied. Franklin assumed parental duties before A.F.J. was even born. After A.F.J.'s birth, Franklin continued to fulfill a parental role and maintained her position as the primary wage earner. Rather than expecting financial compensation, she assumed financial obligations. Knowing that Johnston had no employment, Franklin could not have expected that she would be reimbursed for her efforts. Prior to becoming a foster parent, Franklin "expressed the desire to provide long term care for [A.F.J.]." Clerk's Papers (CP) at 927.

¶40 Pursuant to the laws in place at the time, Franklin was required to become a foster parent in order to maintain care of A.F.J.[8] As a consequence of becoming A.F.J.'s foster parent, Franklin received funds from the State. The Ameri-

___

[8] RCW 13.34.130 requires placement of dependent children only with particular individuals. At the time that A.F.J. was removed from Johnston's custody, RCW 13.34.130 did not allow Franklin to obtain custody, control, and care of A.F.J. without becoming licensed as a foster parent. Former RCW 13.34.130 (2003). This statute was amended in 2007 to allow placement of children with a nonrelative when that person is a "suitable person" who has a preexisting relationship with the child or the child's family. RCW 13.34.130; Laws of 2007, ch. 412, § 2. Had this amendment been in effect at the time that the State removed A.F.J. from

can Law Institute provides a useful explanation of the reason that such a situation does not proscribe de facto parent status:

> The requirement that an individual have performed caretaking functions primarily for nonfinancial reasons does not rule out caretakers who may qualify for financial assistance to care for the child but whose caretaking role was not motivated primarily by that assistance. Thus, for example, family members who take children into their homes primarily out of family affinity may be de facto parents even if, as a result of taking a child into their home, they are able to qualify for welfare benefits, foster-care payments, or other forms of financial assistance.

AM. LAW INST., *supra*, § 2.03 cmt. (c)(ii), at 120. The American Law Institute provides two especially useful illustrations. The first illustration describes an ordinary fostering relationship:

> Wayne and Pattie are foster parents, who have cared for 10-year-old Ford for the past two years.
>
> They are not de facto parents, because their caretaking arrangement is a financial one.

AM. LAW INST., *supra*, § 2.03 cmt. (c)(ii), illus. 19, at 121. In contrast, the second illustration describes a more unusual situation that nevertheless involves a fostering relationship:

> Since her birth, three-year-old Simone has lived with and been cared for by her grandmother, Julia, while her mother, Fortune, drifted in and out of her life. Recently, at the suggestion of a social worker, Julia applied for a state foster-parent license. She is now receiving foster-care payments under a relative foster-care program.
>
> Julia may qualify as a de facto parent, even though she receives foster-care payments to help support Simone, because the caretaking arrangements arose for familial reasons and not primarily for financial ones.

---

Johnston's custody, Franklin would not have been statutorily-required to become a foster parent in order to continue caring for A.F.J.

AM. LAW INST., *supra*, § 2.03 cmt. (c)(ii), illus. 21, at 121. The distinction between these two types of fostering relationships is of significant consequence in determining whether a foster parent can establish de facto parent status.

¶41 As evidenced by the circumstances presented herein, Franklin did not assume the obligations of care for A.F.J. with the expectation that she would receive compensation. Prior to becoming licensed as a foster parent, Franklin cared for A.F.J. for almost eight months without any compensation. Franklin was not a nanny or a child-care provider. Rather, she was A.F.J.'s parental figure while Johnston fought to overcome her drug addiction. That Franklin received some monetary compensation does not change the fact that she assumed the obligations and responsibilities of parenting A.F.J. without any expectation that she would be financially compensated for such care.

¶42 The fourth part of the test, that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship, parental in nature, is also satisfied. A.F.J. was three and a half years old at the time of trial, and Franklin had parented him since his birth. Proof was abundant that the two are bonded in a parent-child, dependent relationship. As Johnston herself recognizes, Franklin is a parent to A.F.J., and A.F.J. believes Franklin to be one of his mothers. One social worker noted that A.F.J. had "clearly developed a primary attachment to [Franklin] as his parent." CP at 949.

¶43 Nevertheless, Johnston contends that by virtue of the State's taking legal custody of A.F.J. when he was only two months old, Franklin cannot have established the requisite parental relationship over a sufficient period of time. We disagree. To begin, there is no time requirement included within the test announced by our Supreme Court.[9]

---

[9] Johnston implies that the relationship must have been developed over a period of at least two years. However, no such time requirement is included within the test announced by our Supreme Court. Rather, the requirement that the alleged de facto parent live with the child for not less than two years is contained within the American Law Institute's standards. *See* AM. LAW INST., *supra*, § 2.03, at

Any stringent time requirement would flout the fact-specific nature of the de facto parentage inquiry. Moreover, as we discussed above, the period of time during which an individual served as a foster parent may be considered in deciding whether the de facto parentage test is met. Franklin parented A.F.J., albeit partly as a foster mother, past the age of three. She has performed the primary parental role for almost all of A.F.J.'s life and, in that capacity, has established a bonded, dependent relationship with A.F.J.

¶44 Franklin also satisfies the fifth part of the test, which requires that the petitioner has fully and completely undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life. The trial court found that Franklin "has been devoted to him and has fully and unequivocally assumed a parental role" and then concluded that "if she does not qualify as a *de facto* parent under the analysis in [*L.B.*], then no one would." CP at 711. Johnston contends that Franklin was not properly found to be a de facto parent because the trial court failed to explicitly find that Franklin undertook a *permanent* parental role. Although the trial court did not utilize each of the words listed in *L.B.*—permanent, unequivocal, committed, and responsible—the trial court's findings imply, and the evidence presented at trial supports, a determination that Franklin undertook a permanent parental role, acted as a responsible parent, and was fully committed to A.F.J.

¶45 Each part of the test that must be met to establish that an individual is a de facto parent is met here. Applying the de facto parentage doctrine to these unusual circumstances does not require us to extend the doctrine beyond its intended scope and does not open the floodgates of de facto parentage claims to those undeserving of such a classification. RCW 13.34.020 declares that "the family unit is a fundamental resource of American life which should be

---

107-08, cmt. (c) at 119. Our Supreme Court explicitly recognized that the American Law Institute's standards for de facto parentage were slightly different from the ones adopted in *L.B.*, and the court did not incorporate any particular time prerequisite into its test. *L.B.*, 155 Wn.2d at 706 n.24.

nurtured." Our holding today is consistent with this public policy goal. Recognizing Franklin's relationship with A.F.J. as a de facto parent-child relationship nurtures the family unit that the parties intentionally formed.[10] Franklin is one of A.F.J.'s mothers, and she should be recognized as such.

¶46 We affirm the trial court's determination that Franklin is A.F.J.'s de facto parent.

¶47 The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.

BECKER and LEACH, JJ., concur.

Review granted at 172 Wn.2d 1017 (2011).

---

[10] Johnston's claim that such a result violates the biological parent's constitutional rights has already been debunked. Our Supreme Court explicitly held that the multipart de facto parentage test adequately protects a biological parent's constitutional rights. *L.B.*, 155 Wn.2d at 710-12 (holding that a de facto parent's rights do not infringe on the fundamental liberty interests of the other legal parent in a family unit because de facto "status can be achieved only through the active encouragement of the biological or adoptive parent by affirmatively establishing a family unit with the de facto parent and child or children that accompany the family").

Johnston also contends that Franklin cannot properly be found to be A.F.J.'s de facto parent because A.F.J.'s biological father was never notified of the proceedings. However, on July 26, 2007, the unknown father's parental rights were permanently terminated by order of the court after default. Accordingly, A.F.J.'s biological father had no right to be notified of further proceedings.