IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| KAES ENTERPRISES, LLC, | No. 77288-1-I |
| Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| KOPPENBERG ENTEPRISES, INC, a Washington corporation, | |
| Respondent. | FILED: November 26, 2018 |

CHUN, J. — Koppenberg Enterprises, Inc. (Koppenberg) held several subcontracts to erect columbaria[1] at national cemeteries for interment of United States veterans. Kaes Enterprises, LLC (Kaes) contracted to supply and ship thousands of marble memorial plaques (niche covers) to various cemeteries for Koppenberg employees to install on the columbaria. Government inspectors visited the sites and rejected many of the installed niche covers as flawed. The contracts obligated Kaes to replace rejected niche covers. As a result, Kaes replaced thousands of niche covers at significant cost. Kaes eventually brought suit against Koppenberg for breach of contract, arguing the replacement niche covers were secondary sales requiring payment from Koppenberg. After a bench trial, the trial court entered judgment in favor of Koppenberg and we affirm.

---

[1] Columbaria are precast concrete units erected in cemeteries and churches to inter urns. Each columbarium has multiple small compartments for urns. Each compartment has a marble plaque or niche cover.

I.
BACKGROUND

Christopher (Chris)[2] Kaes served as a federal contracting officer with the Air Force. After retiring from the Air Force, Chris worked in federal contracting and procurement for other organizations. Chris subsequently formed his own venture, Kaes Enterprises, LLC.

In December 2010, Kaes entered a teaming agreement with Levantina USA, Inc. (Levantina), a large supplier of natural stone, to bid on federal solicitations for niche covers from the Veterans Administration (VA). Kaes contracted with an Alabama marble supplier to cut the niche covers. Levantina prepared the pricing and coordinated shipping from the quarry in Alabama to the project sites.

Koppenberg held VA subcontracts to erect columbaria at veteran memorials in national cemeteries. Owner Kim Koppenberg (Kim) had identified Levantina as a potential supplier of marble niche fronts. Austin Lowrie, the commercial division manager at Levantina, informed Koppenberg all VA projects were bid under the teaming agreement and connected Chris and Kim.

For federal contracts like these veteran memorial projects, the government contracts with a prime contractor. The prime contractor then enters into subcontracts for different aspects of the projects, such as Koppenberg's installation of columbaria. Usually, Memorial Program Services (MPS)[3] supplied

---

[2] This opinion refers to the individuals by their first names to distinguish them from their corporations. We intend no disrespect.

[3] MPS is a government agency that purchases materials directly from suppliers.

Koppenberg with niche covers for its columbaria projects.[4] At the time Kim and Chris met, however, Koppenberg had bid on three contracts for the National Cemetery Administration (NCA),[5] requiring subcontractor-supplied niche covers. Kim and Chris considered this an opportunity for Kaes to begin supplying niche covers for government projects.

In November 2010, Koppenberg received the subcontracts to install columbaria for veteran memorials at Bakersfield National Cemetery, Eagle Point National Cemetery, and Fort Rosecrans National Cemetery. The subcontracts required Koppenberg to provide marble niche covers. The project requirements specified size and color and directed the subcontractor to "[u]nload, inspect, store, and protect niche covers after delivery to the job site and prior to erection."

Koppenberg subsequently submitted purchase orders for Kaes to provide marble niche covers for the three projects. The purchase orders specified, "marble niche fronts 11-1/4" x 15-3/4" x ¾" thick as per approved samples and specifications for this project. All materials that are supplied and rejected must be replaced unless damaged by [sic] after arrival onsite."

Kaes first supplied Eagle Point. Kaes received the Eagle Point purchase order in November 2010. Through Levantina, Kaes obtained the niche covers from a quarry in Alabama and drop shipped them to the cemetery site for installation. Kaes used specially designed foam-lined crates for shipping, with the covers protected by thick polyplastic individual sleeves. The shipment in

---

[4] Kaes had wanted to become involved as a direct supplier to the government through MPS.
[5] NCA is a department of the VA.

fulfillment of the purchase order arrived at Eagle Point in January 2011 and Koppenberg paid in full by March 3, 2011. Kaes delivered niche covers to Bakersfield on March 24, 2011, with payment by Koppenberg on June 13, 2011. Fort Rosecrans received deliveries in satisfaction of the purchase order in April, May, and August, 2011. Koppenberg paid Kaes for these shipments in August and December 2011.

At the time of delivery, Koppenberg employees visually inspected the crates for shipping damage and stored them unopened until installation. At installation, Koppenberg employees unpacked the crates, set the covers in the niches, and screwed each one into place.

After installation, government employees inspected the niche covers for compliance with the specifications. On May 11, 2011, Koppenberg forwarded an email from the VA to Kaes explaining this process: "Typically we have the contractor install the covers they feel meet spec, then MPS comes out to inspect." A follow-up email warned, "[D]on't be surprised if they reject 25% or more."

On May 10 and 11, 2011, an MPS employee visited Bakersfield to inspect the installed niche covers. Inspection occurred at Eagle Point on May 12, 2011. Eagle Point and Bakersfield both had rejection rates of 25 to 30 percent. At Eagle Point, the inspector rejected 777 of the 3,100 installed niche covers.

After the Eagle Point inspection, Lowrie from Levantina met with the MPS inspector to discuss the high rate of rejections. The inspector agreed to select units to serve as examples for the quarry to use in quality control. Lowrie wrote

an email for Koppenberg to forward to the Eagle Point and Bakersfield prime contractors.[6] The email promised changes to production process, quality control inspections, and shipping. The email also assured the prime contractors the supplier and quarry would replace defective units at no cost.

Koppenberg began requesting replacement niche covers, which Kaes supplied in large quantities. In June 2011, Koppenberg requested 750 to 850 replacement niche covers for Bakersfield, reflecting a 25 to 35 percent rejection rate. MPS conducted several rounds of inspections of the various sites, continuing to reject installed niche covers. This resulted in multiple shipments of replacements. Bakersfield received replacements in July and early September 2011. Eagle Point received 800 replacements on June 15, 2011, and 600 more replacements in September 2011. Fort Rosecrans received replacements in August 2011.

In late September 2011, Kaes became extremely concerned about repeated inspections and seemingly arbitrary standards for evaluation of the niche covers. Kaes demanded written explanations for each individual rejected niche cover and contemplated filing a protest or claim against the VA. Kaes sent formal letters to Koppenberg with its demands, stating, "KAES finds the large number of undocumented, unspecified, niches being rejected for this project, with oral notification only, unacceptable." Kaes further demanded, "For the end user to examine and then consider any niche as rejected, they must provide, and we

---

[6] Lowrie sent this email to Kim without including Chris on the message. The trial court found Lowrie to be Kaes's agent with respect to these projects. Kaes does not assign error to this finding, which results in a verity on appeal. See In re Marriage of Akon, 160 Wn. App. 48, 57, 248 P.3d 94 (2011).

require, specific, written documentation for each and every individual niche rejected for purportedly failing to meet specifications." Kaes alerted Koppenberg it would back-charge for returned niche covers meeting specifications and without documentation of the reasons for rejection.

Koppenberg passed this message to the prime contractors for the projects. But by November 4, 2011, Kaes had not received any specific documentation for individual rejected niche covers. The returned, rejected niche covers arrived at the quarry with serious damage because Koppenberg shipped them without their original packaging.

Despite lack of compliance with the demand for detailed documentation of individual rejections, Kaes continued supplying replacement niche covers. Eagle Point received replacements in November and December 2011. In total, Kaes supplied approximately 8,800 replacement niche covers.

In September 2011, Kaes attempted to solicit help from Koppenberg and the prime contractors to protest the repeated inspections and rejections by MPS. Koppenberg appeared sympathetic with Kaes's complaints, but never pursued a grievance or claim. Instead, Koppenberg signed unconditional releases to close the projects.

On August 11, 2015, Kaes brought a breach of contract claim against Koppenberg. Kaes argued Koppenberg accepted and used the goods, requiring payment for all replacement niche covers. After a bench trial, the trial court entered judgment for Koppenberg.

Kaes appeals.

## II.
## DISCUSSION

A.  Affirmative Defenses

Kaes argues the trial court erred by allowing Koppenberg to argue the unpled affirmative defenses of rejection and revocation.  The trial court determined Koppenberg's answer to the complaint put "the issues of acceptance, rejection and revocation of acceptance before the court."  Additionally, the trial court concluded Kaes did not allege surprise or prejudice due to Koppenberg's failure to formally assert the affirmative defenses.  While we disagree in part with the trial court's reasoning, we conclude Kaes effectively waived any objection to Koppenberg's failure to affirmatively plead defense.

Affirmative defenses must be specifically pleaded.  CR 8(c).  This applies to any "matter constituting an avoidance or affirmative defense."  CR 8(c).  Courts consider revocation of acceptance as an affirmative defense that must be set forth in the pleadings.  Allis-Chalmers Corp. v. Sygitowicz, 18 Wn. App. 658, 660, 571 P.2d 224 (1977).

Generally, affirmative defenses are waived unless they are affirmatively pleaded, asserted under CR 12(b), or tried by the express or implied consent of the parties.  Bickford v. City of Seattle, 104 Wn. App. 809, 813, 17 P.3d 1240 (2001).  However, "the rule's policy is to avoid surprise and affirmative pleading is not always required."  Bickford, 104 Wn. App. at 813.  Thus, a court considers noncompliance harmless when the failure to plead an affirmative defense does not affect the substantial rights of the parties.  Hogan v. Sacred Heart Medical Center, 101 Wn. App. 43, 54-55, 2 P.3d 968 (2000).  Additionally, "objection to a

failure to comply with the rule is waived where there is written and oral argument to the court without objection on the legal issues raised in connection with the defense." Mahoney v. Tingley, 85 Wn.2d 95, 100, 529 P.2d 1068 (1975).

An appellate court reviews trial court decisions on the application of the civil rules for abuse of discretion. Sprague v. Sysco Corp., 97 Wn. App. 169, 171, 982 P.2d 1202 (1999).

Kaes's complaint alleged, "Koppenberg has accepted and/or used all products from Plaintiff Kaes." The trial court concluded Koppenberg's denial of this allegation effectively raised the issue of rejection. But denial of an allegation does not amount to affirmative pleading. Koppenberg specifically enumerated several affirmative defenses in its answer to the complaint, but omitted any mention of revocation of acceptance.

Despite Koppenberg's failure to plead the issue, rejection of the niche covers occupied a significant portion of the trial testimony and evidence. Both parties introduced evidence of Koppenberg's receipt of the product, installation, rejection, and requests for replacement niche covers. Therefore, the parties argued the issue of Koppenberg's rejection of the niche covers without objection. This constitutes waiver of objection to the failure to comply with CR 8(c). See Mahoney, 85 Wn.2d at 100. Furthermore, given the significant evidence from both parties on the issue of rejection, Kaes cannot demonstrate surprise.

Noncompliance with CR 8(c) was of no consequence.[7] The trial court did not abuse its discretion by considering the unpled affirmative defense.

### B. Contract Interpretation

Kaes assigns errors to many of the trial court's conclusions of law pertaining to interpretation of the contracts. Where the trial court has weighed the evidence, the reviewing court's role is limited to determining whether substantial evidence supports the findings of fact, and whether those findings in turn support the trial court's conclusions of law. Ford Motor Co. v. City of Seattle, Exec. Serv. Dep't., 160 Wn.2d 32, 56, 156 P.3d 185 (2007). "Substantial evidence to support a finding of fact exists where there is sufficient evidence in the record 'to persuade a rational, fair-minded person of the truth of the finding.'" Hegwine v. Longview Fibre Co., Inc., 162 Wn.2d 340, 353, 172 P.3d 688 (2007) (quoting In re Estate of Jones, 152 Wn.2d 1, 8, 93 P.3d 147 (2004)). An appellate court will not substitute its judgment for that of the trial court, reweigh the evidence, or adjudge witness credibility. In re Marriage of Rockwell, 141 Wn. App. 235, 242, 170 P.3d 572 (2007). Questions of law are reviewed de novo. Hegwine, 162 Wn.2d at 353.

#### 1. Incomplete Record

As a threshold issue, we address the incomplete record before us on review. Kaes assigns error to the trial court's conclusions of law but only

---

[7] Additionally, "[w]hen issues that are not raised by the pleadings are tried by express or implied consent of the parties, they will be treated in all respects as if they had been raised in the pleadings." Dewey v. Tacoma Sch. Dist. No. 10, 95 Wn. App. 18, 26, 974 P.2d 847 (1999). On appeal, an appellate court can deem the pleadings to have been amended to conform to the proof. See Maziarski v. Blair, 83 Wn. App. 835, 839, 924 P.2d 409 (1996).

9

designated a partial record, omitting the verbatim reports of proceedings of the direct testimony of Kim and Carlton Fuqua, a Koppenberg employee. This impedes our review of Kaes's assignments of error.

"The party presenting an issue for review has the burden of providing an adequate record to establish such error." State v. Sisouvanh, 175 Wn.2d 607, 619, 290 P.3d 942 (2012); see RAP 9.2(b). An incomplete record compromises the ability of the appellate court to review the trial court's findings of fact for substantial evidence. In re Parentage and Custody of A.F.J., 161 Wn. App. 803, 806 n.2, 260 P.3d 889 (2011). Therefore, in such instances, we treat the findings as verities on appeal. A.F.J., 161 Wn. App. 806 n.2.

Kaes challenges the trial court's findings of fact and conclusions of law, but failed to provide complete verbatim reports of proceedings. We cannot fairly evaluate the findings based on the record before the trial court. Therefore, we consider the court's findings of fact as verities.

2. Uniform Commercial Code (UCC) and Parol Evidence

Kaes contends the trial court erred by employing usage of trade, course of performance, and the prime and subcontractor contracts to interpret the purchase orders. Kaes asserts the purchase orders constituted contracts to provide goods governed by the UCC. It contends the installation of the niche covers constituted acceptance, and that Koppenberg improperly rejected those goods thereafter. Accordingly, Kaes claims Koppenberg must pay for all the niche covers in keeping with the terms of the contract. Koppenberg argues parol

evidence demonstrates the intention to inspect after installation and for Kaes to supply replacement niche covers without additional charge.

Under the UCC, the terms of a contract intended by the parties as a final expression of their agreement may not be contradicted by evidence of prior agreement or of a contemporaneous oral agreement. RCW 62A.2-202(a). However, the contract may be "explained or supplemented" by course of performance,[8] usage of trade, and evidence of consistent additional terms.[9] RCW 62A.2-202(a), (b). Course of performance and usage of trade are relevant "in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement." RCW 62A.1-303(d). The terms of an agreement and course of performance or usage of trade must be construed consistently whenever reasonable. RCW 62A.2-103(e).

Kaes contends the trial court should have followed Cervitor Kitchens, Inc. v. Chapman, 82 Wn.2d 673, 513 P.2d 25 (1973), and found Koppenberg's installation of the niche covers constituted acceptance of the products under the UCC. In that case, Cervitor Kitchens sued to recover the sale price of four kitchen units. Cervitor, 82 Wn.2d at 674. The company shipped the units, which

---

[8] A course of performance "is a sequence of conduct between the parties to a particular transaction that exists if: (1) The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and (2) The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection." RCW 62A.1-303(a).

[9] Usage of trade "is any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question." RCW 62A.1-303(c). Evidence of relevant usage of trade offered by one party is not admissible unless the party has given sufficient notice to prevent unfair surprise. RCW 62A.1-303(g).

11

the contractor did not inspect upon delivery. Cervitor, 82 Wn.2d at 675. After installation of the kitchen units, the contractor attempted to reject the units, citing poor quality and failure to comply with specifications. Cervitor, 82 Wn.2d at 675. The Washington Supreme Court determined installation of the kitchen units was inconsistent with continuing ownership of the seller and amounted to acceptance of the products despite any defects. 82 Wn.2d at 676-77. Like Cervitor, Kaes claims Koppenberg's installation of the niche covers was inconsistent with Kaes's continuing ownership of the product and reflected acceptance of the goods under the contract.

The trial court determined Cervitor did not apply because of the additional requirements established by the terms of the prime and subcontracts, usage of trade, and course of performance between the parties. The trial court properly considered this evidence under RCW 62A.1-202. As a result of the parol evidence, the trial court determined the purchase orders legally entitled the VA, prime contractors, and Koppenberg to inspect and reject or revoke acceptance of nonconforming niche covers until final inspection. The purchase orders required Kaes to replace the nonconforming niche covers without charge, regardless of installation.

The trial court's findings of fact, which are verities in this appeal, illustrate incorporation of the VA contract terms, usage of trade within the industry, and a clear course of performance between Kaes and Koppenberg to support this interpretation of the contracts. The parol evidence demonstrates Kaes was aware of the typical process of installation followed by inspection and possible

rejection of the niche covers. In addition, Kaes repeatedly provided replacement covers long after delivery of the original shipments.

The trial court found the language in the purchase orders bound Kaes to the specification of the VA contracts. The VA contracts with prime contractors and subcontractors provided terms and specifications for marble used in the projects. The purchase orders' reference to "approved samples and specifications for this project" referred to the specification established by the VA contracts. These verities on appeal support the trial court's conclusion of law that the purchase orders required Kaes to replace all non-conforming niche covers after installation and inspection.[10]

The trial court also included extensive findings of fact about usage of trade for military cemetery construction projects. These findings detailed the niche cover process from arrival and crate inspection, through installation, VA inspection, rejection, and replacement, until final inspection at the end of the project. The findings conclude Koppenberg and Kaes knew of and followed the usage of trade in delivery, handling, installation, and inspection of the marble niche covers.[11] This usage of trade then properly informed the trial court's interpretation of the purchase orders.

As for course of performance, the trial court described the working relationship between Kaes and Koppenberg throughout fulfillment of the

---

[10] The trial court provided few findings on the incorporation of the federal prime and subcontract terms in the purchase orders. Nonetheless, the extensive findings about usage of trade and course of performance provide ample support for the trial court's ultimate conclusion that the purchase orders required Kaes to replace all rejected niche covers at no additional cost.

[11] The trial court further determined the usage of trade caused Kaes no unfair surprise or prejudice. Like the other findings of fact, this is a verity on appeal.

purchase orders.[12] The court found Kaes knew Koppenberg employees inspected just the crates on arrival, leaving the niche covers securely packaged inside. At the time of installation, Koppenberg employees uncrated and screwed the niche covers in place. After installation, VA inspectors evaluated and rejected large numbers of niche covers as non-conforming. Kaes then replaced the rejected niche covers. Kaes and Lowrie worked to improve quality and coordinate delivery of the replacement niche covers. Between the three projects, Kaes replaced over 8,000 niche covers.

In light of these findings, the trial court determined the purchase orders entitled the VA, prime contractors, and Koppenberg to inspect and reject all non-conforming niche covers until final inspection by the VA. The purchase orders also required Kaes to replace rejected niche covers without charge, regardless of installation or payment. The course of performance between the parties shows

---

[12] Although Kaes provided incomplete verbatim reports of proceedings, Kaes submitted hundreds of pages of exhibits. These exhibits support the course of performance described by the trial court. As early as May 2, 2011, Koppenberg informed Kaes that inspection did not occur upon arrival of the shipment, but waited until setting of the niche covers. "As far as the quality, we really cant [sic] tell until we break it open and start setting them." Soon after, Kaes received the email describing the process in which the contractor installs the covers and then MPS inspects. An MPS inspector confirmed this process by inspecting and reporting only on the installed niche covers.

Given the timing of delivery, inspection, and rejection, Kaes knew rejection did not occur immediately upon arrival, yet agreed to replace the rejected niche covers when MPS rejected them after installation. The original delivery of niche covers arrived in Bakersfield in March 2011. The first inspection and associated rejections occurred in May 2011. Kaes shipped replacement niche covers in July and September 2011. Similarly, in Eagle Point, the original delivery of niche covers occurred in January 2011 with the first inspection and rejection occurring in May 2011. Kaes shipped replacement covers in June, August, November, and December 2011. Finally, Fort Rosecrans received its original shipments of niche covers in April and August 2011. Inspection occurred thereafter with replacements coming in August and October 2011.

Thus, beginning in May 2011, Kaes was aware government inspectors rejected marble niche covers after installation. From May to September 2011, Kaes supplied replacements for those rejected covers and worked to improve the quality of the product to reduce the number of rejections. Thus, the record demonstrates Kaes's commitment to fulfilling the requests for quality replacements of rejected niche covers under the terms of the contracts.

Kaes's intention to work with Koppenberg to provide suitable niche covers to replace those rejected by MPS after installation. This course of performance properly served as parol evidence for the parties' contractual relationship. Based on this evidence, Kaes provided the niche covers, expecting installation and subsequent inspection. Kaes also agreed to replace the rejections free of charge. These findings support the trial court's legal conclusion that Koppenberg complied with the rejection process established by course of performance and usage of trade, resulting in no legal obligation to pay Kaes the replacement niche covers.

C. Documentation of Rejections

Kaes contends the trial court failed to consider its demand for detailed written rejection of each niche cover under RCW 62A.2-605. Koppenberg argues Kaes waived this requirement. We agree.

Under the UCC, "[t]he buyer's failure to state in connection with rejection a particular defect which is ascertainable by reasonable inspection precludes him or her from relying on the unstated defect to justify rejection or to establish breach." RCW 62A.2-605(1). In addition, "a course of performance is relevant to show a waiver or modification of any term inconsistent with the course of performance." RCW 62A.1-303(f).

The trial court concluded Kaes had waived the written notification of non-conformity because it did not raise the issue until several months after a significant portion of the niche covers had been inspected and rejected. The trial court's findings on the parties' course of performance supports this conclusion.

Kaes received notification of the first rejections and need to replace niche covers in May 2011 but did not begin requesting detailed written documentation until late September 2011. By the time of the request, Kaes had already shipped approximately 6,300 replacement niche covers, representing the majority of the 8,200 replacements provided.

Given this history, the trial court properly considered Kaes's failure to request written rejection until after shipping thousands of replacement niche covers as evidence of the parties' course of performance. The course of performance supports the trial court's legal conclusion that Kaes waived written rejection.

### D. Retainage

Kaes claims Koppenberg improperly withheld retainage and the trial court failed to award the retained $26,626.00. Kaes cites Kim's admission of withholding retainage and an entry in an exhibit detailing Koppenberg, "[u]nder paid by $26,626.00 for expenses for replacing rejected niche fronts on all projects due to rejected materials." Koppenberg claims all funds were paid.

The trial court made no findings of fact or conclusions of law on this issue. In the absence of a finding of fact, an appellate court "must indulge in the presumption that the party with the burden of proof failed to sustain their burden on this issue." In re Welfare of A.B., 168 Wn.2d 908, 927 n.42, 232 P.3d 1104 (2010). Because Kaes had the burden of proving breach of contract, the trial court's failure to enter a finding of fact is construed as Kaes's failure to meet this burden of proof.

16

Other than described above, Kaes failed to produce evidence Koppenberg withheld funds as retainage. Koppenberg provided evidence all funds were paid. Therefore, substantial evidence supports the trial court's conclusion.

We affirm.

_Chun, J._

WE CONCUR:

_Andrus, J._          _Becker, J._

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON
2018 NOV 26 AM 8:56