[No. 33507-7-II.  Division Two.  August 8, 2006.]

*In the Matter of the Marriage of* JEFFREY E. ANDERSON, *Appellant,* and PATRICIA N. ANDERSON, *Respondent.*

*Clayton R. Dickinson*, for appellant.

*Joseph J. Loran*; and *Daniel W. Smith* and *Boyd S. Wiley* (of *Campbell Dille Barnett Smith & Wiley*), for respondent.

¶1 HOUGHTON, J. — Jeffrey Anderson appeals a trial court's ruling that *In re Parentage of C.A.M.A.*, 154 Wn.2d 52, 109 P.3d 405 (2005), precluded him from enforcing visitation rights with his former stepdaughter, Ariel. We agree that Jeffrey[1] has the right to visitation under a 1998 parenting plan that has never been vacated or amended. Therefore, we reverse and remand for further proceedings.

FACTS

¶2 Patricia met Jeffrey when her daughter Ariel, born in March 1992, was about one year old. Ariel's biological father has never been legally determined. Patricia married Jeffrey in 1993, and they had a second child, Tyler, in 1994. They separated in 1996 and dissolved their marriage in June 1998. The court awarded Jeffrey visitation rights.

¶3 In an action separate from Jeffrey and Patricia's dissolution case, Kassandra Raymond, Patricia's sister,

---

[1] For clarity, we refer to the parties by their first names.

petitioned for a "custody decree" regarding Ariel.[2] On June 17, 1998, a court issued an order titled "custody decree," which gave Kassandra only certain visitation rights with Ariel. This decree adopted an agreement between Kassandra and Patricia. It also briefly recognized Jeffrey's visitation rights.

¶4 Thirteen days later, on June 30, a different court that heard the dissolution action entered a final parenting plan that gave custody of Ariel to Patricia and custody of Tyler to Jeffrey. According to the parenting plan, Jeffrey had visitation rights with Ariel. The court found, "Ariel . . . is not the biological child of [Jeffrey]. However, [he] had played a major role in this child's growth and development. It is in the child's best interest that [he] have visitation." Clerk's Papers (CP) at 63. The parenting plan, however, does not mention Kassandra's decree or her separately awarded visitation rights. The record does not disclose whether, when it signed the parenting plan on June 30, the court knew that 13 days earlier Kassandra and Patricia had reached an agreement as to visitation that was incorporated into a "decree" signed by a different court.[3]

¶5 It appears[4] that Kassandra later filed another petition for a custody order because, on May 11, 2000, a superior court commissioner entered a temporary nonparental custody order giving Kassandra temporary custody of Ariel. This temporary nonparental custody order stated, "The respondent Patricia Anderson is restrained from molesting or disturbing the peace of . . . Ariel Cavin."[5] CP at 50.

[2] According to Marianne Anderson, Jeffrey's mother, Kassandra brought this action to stop Patricia from moving to Ohio to be near their biological father, Gerald Singleton.

[3] We cannot discern whether the court officer signing the "decree" was a superior court judge or a commissioner.

[4] We use the word "appears" here because the record does not show when Kassandra petitioned for this second custody decree. But considering that there were two custody decrees involving Kassandra, this seems to be the most logical inference.

[5] Jeffrey's June 3, 2005 motion indicates that Ariel resided with Kassandra in Washington from May 2000 to October 2001; with Patricia in Ohio from October

It also provided, "Any visitation involving Ariel Cavin shall be as determined by this court under this cause number. Ariel is not of issue in the dissolution of marriage case . . . and said case has no jurisdiction over Ariel Cavin."[6] CP at 51.

¶6 According to Paul and Sandra Cavins' (Patricia's stepfather and mother) Respondents' Brief at 1, on February 10, 2005,[7] a court awarded them legal custody of Ariel. Although the clerk's papers and the case docket do not include any information on this custody decree, we assume that the Cavins obtained legal custody of Ariel because Jeffrey does not contest their assertion. According to Jeffrey, once the Cavins had obtained the custody of Ariel, they began to cut back on his visitation time and eventually disallowed him from seeing Ariel.[8]

¶7 On June 2, 2005, Jeffrey filed a motion for a temporary order to enforce his visitation rights. The next day, he also petitioned to modify the "custody decree/parenting plan/residential schedule."[9] CP at 52. During a hearing on the petition, the trial court stated,

> I think it's important that we start with the Supreme Court decision that just came down recently.[10] And it does put the—whatever it was before in terms of third-party visitation, it's no longer there.

2001 to 2002; with Gerald Singleton in Ohio from 2002 to June 2003; and finally, since 2003, in Washington with Patricia's stepfather Paul Cavin and mother Sandra Cavin.

[6] There is no explanation why the superior court commissioner stated that Ariel was not subject to the dissolution court's jurisdiction. Perhaps he relied on the "decree" entered in Kassandra's action that granted her only visitation rights.

[7] The Cavins filed a respondent's opening brief and Patricia filed a separate respondent's brief, simply stating that she "concurs with and supports" them. Resp't's Br. (Patricia) at 1.

[8] Jeffrey had exercised his vacation and holiday visitation rights from 1998 until April 2005.

[9] During oral argument, Jeffrey clarified that, in his inaptly titled pleadings, he petitioned only to enforce the 1998 parenting plan, not to modify a decree or a parenting plan.

[10] The trial court refers to *C.A.M.A.*, 154 Wn.2d 52.

Now, for him to say that there is some harm caused if she, the young 13-year-old girl doesn't see him, I don't see that. I don't see it. Seven years ago someone said something about relationships[11] but here we are seven years later. I don't see that.

I don't understand why Commissioner Orlando's decision would be improper when he made reference—he had everything before him. And he said what he said considering everything else that was going on. He said this court order rules on the child, Ariel.

I'm not going to vacate anything. I'm just going to leave it as it is.

Report of Proceedings at 19. Thus, the court denied Jeffrey's petition and ordered,

1. The court order issued by Court Commissioner James R. Orlando dated May 11, 2000 . . . is not vacated. Jeff Anderson was not a party to the proceeding in which the May 11, 2000 order was entered. . . . There are no circumstances under CR 60 that would allow for vacating said order.

2. Jeff Anderson is without standing to seek visitation with his ex-stepdaughter Ariel Cavin pursuant to the CAMA[12] case.

CP at 57-58. Jeffrey appeals.

---

[11] The court refers to Steve Downing's guardian ad litem report in the dissolution action, which stated, "I do believe that it would be damaging to Ariel to be completely and totally separated from Jeff who has, in reality, been the only father she has ever known. While she is not part of this investigation, I do feel it important to have made that statement." CP at 18.

[12] In *C.A.M.A.*, our Supreme Court held, "The unconstitutional portions of RCW 26.09.240 [third party visitation], combined with the constitutionally required presumptions which are not contained in the text, render the entire statute unconstitutional." 154 Wn.2d at 66. More recently, the Court reaffirmed *C.A.M.A.* in *In re Parentage of L.B.*, where it stated that "based on our holdings in *Smith* and *C.A.M.A.*, until the legislature amends the relevant statutes, there exists no statutory right to third party visitation in Washington." *In re Parentage of L.B.*, 155 Wn.2d 679, 714-15, 122 P.3d 161 (2005), *cert. denied*, ___ U.S. ___, 126 S. Ct. 2021 (2006); *In re Custody of Smith*, 137 Wn.2d 1, 969 P.2d 21 (1998), *aff'd sub nom. Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). As of this writing, the legislature has not reenacted third party visitation legislation.

## ANALYSIS

### LEGAL BASIS SUPPORTING JEFFREY'S VISITATION RIGHTS

■■ ¶8 Jeffrey contends that the trial court erred in deciding that *C.A.M.A.* precluded him from seeking visitation with his former stepdaughter because it determined that he had no standing to seek visitation. But we need not turn to *C.A.M.A.* to analyze this issue because Jeffrey already had an order allowing visitation, the one issued in the 1998 dissolution action. That is, without running awry of *C.A.M.A.*, Jeffrey could enforce the original parenting plan order because it had not been amended or vacated and because he had exercised his visitation rights since 1998.[13]

¶9 During argument, Patricia asserted that *C.A.M.A.* retroactively voids any order that gave stepparents in Washington visitation with their former stepchildren. We disagree.

¶10 *C.A.M.A.* applies prospectively. "[W]hen the United States Supreme Court remands a case, unless it *explicitly* reserves the issue of retroactive application of that case, the normal rule of retroactivity is assumed." *Digital Equip. Corp. v. Dep't of Revenue*, 129 Wn.2d 177, 188, 916 P.2d 933 (1996) (footnote omitted). But in *Troxel v. Granville*, which was the basis of our Supreme Court's *C.A.M.A.* decision, the United States Supreme Court stated,

> we do not consider the primary constitutional question passed on by the Washington Supreme Court—whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation. We do not, and need not, define today the precise scope of the parental due process right in the visitation context. . . . Because much state-court adjudication in this context occurs on a case-by-case basis, we would be hesitant to hold that specific nonparental visitation statutes violate the Due Process Clause as a *per se* matter.

530 U.S. 57, 73, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000).

---

[13] On the other hand, if after *C.A.M.A*, Jeffrey had instead filed a new petition for third party visitation, *C.A.M.A* would preclude his getting visitation.

¶11 Thus, it concluded, "it is apparent that the entry of the visitation order *in this case* violated the Constitution" and held that Washington's third party visitation statute violated the mother's "due process right to make decisions concerning the care, custody, and control of her daughters." *Troxel*, 530 U.S. at 75 (emphasis added). Because the United States Supreme Court explicitly stated that it was not finding the statute per se unconstitutional, the presumption of retroactivity does not attach.

¶12 Further, when retroactive application causes hardships and inequities, our Supreme Court allows courts to give only prospective effect to its decision to hold a statute unconstitutional. *See, e.g., Bond v. Burrows*, 103 Wn.2d 153, 163-64, 690 P.2d 1168 (1984) ("On the basis of the circumstances and equities of this case, the foregoing considerations and authorities persuade us of the appropriateness of prospective effect to our holding that RCW 82.04.2902(1) and (2) are unconstitutional."). Here, given the important role Jeffrey played during Ariel's formative years and his exercise of his visitation rights since the dissolution, we cannot terminate his visitation rights without good reason. Such an abrupt severance of a familial relationship will only entail inequitable consequences. Accordingly, *C.A.M.A.* does not retroactively revoke Jeffrey's visitation rights under his 1998 parenting plan.

¶13 In sum, Jeffrey has the right to enforce his visitation rights provided by the parenting plan entered in the 1998 dissolution action. Because *C.A.M.A.* does not apply retroactively, it does not preclude enforcing Jeffrey's visitation rights.

EQUITY

¶14 Equity principles provide an alternative ground for enforcing Jeffrey's visitation rights. After *C.A.M.A.,* no statutory scheme allows third party visitation. But "[i]t is well recognized, both in Washington and nationally, that child custody and visitation orders may be established by

reliance on courts' equity powers and the common law."[14] *In re Parentage of L.B.*, 155 Wn.2d 679, 698 n.18, 122 P.3d 161 (2005), *cert. denied,* ___ U.S. ___, 126 S. Ct. 2021 (2006). "The equitable power of the courts to adjudicate relationships between children and families is well recognized, and our legislature has evinced no intent to preclude the application of an equitable remedy." *In re Parentage of L.B.*, 155 Wn.2d at 683.

¶15 In recent years, courts in sister states have awarded visitation rights to third parties despite the absence of any statutory basis. For instance, in *Koelle v. Zwiren*, defendant deceived the plaintiff into believing that he was the father of her child. 284 Ill. App. 3d 778, 672 N.E.2d 868, 870-71, 220 Ill. Dec. 51 (1996). After learning the truth eight years later, the plaintiff asked an Illinois court to grant him, among other things, equitable relief to include visitation rights with the child. *Koelle*, 672 N.E.2d at 871. Defendant responded that the plaintiff was not entitled to visitation because he was not a natural or an adoptive parent. *Koelle*, 672 N.E.2d at 871. The trial court dismissed the plaintiff's equitable claim for visitation. *Koelle*, 672 N.E.2d at 871.

¶16 The Illinois appellate court reversed, holding, "While it is true that these statutes do not provide the grounds for plaintiff's claim for visitation privileges in this case, Illinois case law and general principles of equity support the claim." *Koelle*, 672 N.E.2d at 872. The court remanded the case to the trial court with instructions to grant plaintiff visitation rights if doing so would be in the child's best interests. *Koelle*, 672 N.E.2d at 873.

¶17 Similarly, other jurisdictions recognize the courts' equitable power to grant visitation to third parties outside

[14] Our Supreme Court recently noted that a child's "fundamental right to a stable and healthy family life . . . . include[s] independently valued protections of a *child's* relationship with siblings and with adults other than his or her biological parents with whom the child has formed a critical bond." *In re Custody of Shields*, 157 Wn.2d 126, 151, 136 P.3d 117 (2006) (Bridge, J., concurring). Such a right of a child is "of paramount importance because . . . in any placement dispute it is *the child* who is the most vulnerable and the most voiceless." *Shields*, 157 Wn.2d at 151 (Bridge, J., concurring).

any statutory scheme. *See, e.g., In re Custody of H.S.H.-K.,* 193 Wis. 2d 649, 533 N.W.2d 419, 431 (1995) ("It is reasonable to infer that the legislature did not intend the visitation statutes to bar the courts from exercising their equitable power to order visitation in circumstances not included within the statutes but in conformity with the policy directions set forth in the statutes."); *see also E.N.O. v. L.M.M.,* 429 Mass. 824, 711 N.E.2d 886, 890, 893 (1999) (holding that the "equity jurisdiction" of the probate and family court allowed the court to grant, despite a lack of statutory authority, the biological mother's former partner visitation with a child she had parented until the child was over three years old). All these courts awarded visitation to third parties based on equity in the absence of express statutory authority.

¶18 The same principles apply here. In 1998, Patricia and Jeffrey, the guardian ad litem, and the trial court determined that Jeffrey should have the right to visit Ariel. Absent finding that it is no longer in Ariel's best interest, Jeffrey should be allowed to exercise those rights.

ATTORNEY FEES

¶19 Patricia seeks attorney fees based on RCW 26-.10.190, which provides, "If the court finds that a motion to modify a prior custody decree has been brought in bad faith, the court shall assess the attorney's fees and court costs of the custodian against the petitioner." Resp'ts' Br. (Cavins) at 10. We decline to award Patricia fees under this statute for two reasons.

¶20 First, Jeffrey moved to enforce his visitation rights and not to modify a prior custody decree, rendering the statute inapplicable. Second, even if RCW 26.10.190 applied, Patricia cannot show that Jeffrey acted in bad faith.

¶21 Patricia also seeks attorney fees under RCW 26.10.080, which provides,

The court from time to time, after considering the financial resources of all parties, may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for reasonable attorney's fees or other professional fees in connection therewith, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or enforcement or modification proceedings after entry of judgment.

Upon any appeal, the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorney's fees in addition to statutory costs.

Resp'ts' Br. (Cavins) at 10. She articulates no reason why she should receive attorney fees, nor did she comply with RAP 18.1(c) by filing a financial declaration.

¶22 Jeffrey also seeks fees, but he sets forth neither basis nor reasoning to support his request. We decline to award fees to either party.

¶23 Reversed and remanded for further proceedings to enforce Jeffrey's visitation rights under the 1998 parenting plan.

BRIDGEWATER and PENOYAR, JJ., concur.