[No. 41211-0-II.    Division Two.    December 6, 2011.]

*In the Matter of the Custody of* B.M.H.

M.J.H., *Respondent*, v. L.L.H, *Petitioner.*

362

*Valerie A Villacin* and *Catherine Wright Smith* (of *Smith Goodfriend PS*); and *Robert M. Vukanovich*, for appellant/petitioner.

*Carolyn M. Drew* and *Patricia S. Novotny*, for respondent.

*Sarah E. Lysons* and *Katherine D. Bennett* on behalf of Center for Children Legal Voice, amicus curiae.

*Bobbe J. Bridge* on behalf of Center for Children and Youth Justice, amicus curiae.

*Jean Waller*, amicus curiae.

¶1 PENOYAR, C.J. — MH, the former stepfather of 12-year-old BMH,[1] petitioned the trial court to designate him as BMH's de facto parent or, alternatively, to award him nonparental custody of BMH. The trial court dismissed MH's de facto parentage action, concluding that *In re Parentage of M.F.*, 168 Wn.2d 528, 228 P.3d 1270 (2010), and the availability of other statutory remedies precluded such an action. The trial court ordered a show cause hearing on the nonparental custody action, finding that MH had established adequate cause for the hearing. On the motion of LH, BMH's mother, we granted discretionary review to determine whether the trial court erred by entering the adequate cause finding. MH cross appeals, arguing that the trial court erred by dismissing his de facto parentage action. Additionally, he contends that the trial court should have appointed counsel for BMH. We affirm the trial court's adequate cause finding, reverse the dismissal of the de facto parentage action, and remand for a show cause hearing on the nonparental custody action and for a hearing to determine whether MH is BMH's de facto parent. Additionally, we decline to address the issue of appointed counsel.

[1] We use initials throughout this opinion to protect BMH's privacy.

## FACTS

¶2 In 1993, LH and MH entered into a romantic relationship. Two years later, they had a son, CH. The couple separated in 1998 without having married. Later that year, LH became engaged to another man, who died in a work-related accident in February 1999 while LH was pregnant with his child, BMH.

¶3 According to LH, MH provided significant emotional support to her during her pregnancy with BMH. MH was present at BMH's birth and cut his umbilical cord. Shortly after BMH's birth, LH and MH married. The marriage did not last, however, and the couple divorced in 2001. The resulting parenting plan identified LH as CH's primary residential parent and gave MH residential time every other weekend. The parenting plan did not include parenting provisions for BMH.

¶4 After the divorce, LH resided with both children in Vancouver, Washington. LH allowed substantial visitation between BMH and MH, who also lived in Vancouver. Both parties state that before the initiation of litigation, BMH generally followed the same residential schedule as CH. LH remarried in 2007 and divorced in 2008.

¶5 MH has been actively involved in BMH's life. In 2002, LH changed BMH's last name from the biological father's last name to MH's last name. In 2007, LH and MH discussed the possibility of having MH adopt BMH. According to the guardian ad litem (GAL), adoption was not pursued because of the impact it might have on the survivor benefits that BMH receives from his biological father.[2]

¶6 In the summer of 2009, CH went to live with MH. The parties dispute the reasons for the move. In late 2009 or early 2010, MH learned that LH planned to move with

---

[2] BMH receives Social Security and worker's compensation benefits as a result of his biological father's death. Apparently, BMH is also the beneficiary of a trust that contains proceeds from a wrongful death lawsuit.

BMH from Vancouver to her boyfriend's house in Castle Rock, about 50 miles away.

I. NONPARENTAL CUSTODY AND DE FACTO PARENTAGE PETITION

¶7 On February 23, 2010, MH filed a nonparental custody petition, alleging that LH was not a suitable custodian for BMH because she intended to "immediately relocate the child to a situation that is unstable and not in the child's best interest." Clerk's Papers (CP) at 3. He explained that LH was "threatening to move [BMH] out of the area and thus disrupt the close relationship that [MH] and [BMH] have together." CP at 4. MH's petition also asked the trial court to find that he was BMH's de facto parent.[3]

¶8 With his petition, MH submitted a declaration alleging that LH's move to Castle Rock to live with her boyfriend of approximately four months would disrupt BMH's life by taking him out of his current school, "which is the only school he's ever attended, and taking him out of the current baseball program away from the children that he has grown up playing with." CP at 23. MH's declaration also recounted his visitation history with BMH after he and LH divorced:

> Although we had no parenting plan for [BMH], [BMH] was with me on exactly the same schedule as [CH] for the most part .... We ultimately settled on a residential schedule where I had the boys on Thursdays through either Sunday night or Monday mornings on alternating weekends and every Thursday overnight in addition to half of the summers and splitting the holidays. . . . Since the time of our divorce, when [LH] does not have a boyfriend or husband in her life we communicate fabulously and we don't have issues with regard to our residential time with the children. However, [LH] also has a disturbing pattern of getting into multiple and very short-term relationships with other men and frequently during those

---

[3] In a separate action, MH also sought to modify the parenting plan with regard to CH. Although the trial court considered the modification action together with MH's de facto parent and nonparental custody actions, this appeal does not involve any issues related to modification.

times she has on occasion tried to limit my involvement with our son, [BMH].

CP at 19-20. MH also stated in his declaration that BMH continued to reside with him "on alternating weekends from Thursday through Sunday or Monday and additional time as we agree and as makes sense." CP at 21.

¶9 MH's declaration described one occasion when LH told him that he could no longer see BMH because he had given BMH a birthday card from BMH's maternal grand-parents against her wishes. On that occasion, "[LH]'s anger was short lived and she ended up apologizing and telling me she would never do that again." CP at 20.

¶10 MH stated that in August 2007, when LH started to date the man that she later married in December 2007, "she began to pull [BMH] away from seeing me. For the first time in [BMH's] 8 year life[, she] began splitting [BMH] and [CH] up during visitation." CP at 20. LH divorced that husband in 2008. CP at 21. According to MH, "LH has had a number of relationships since her divorce in 2008. . . . However, fortunately until now [LH] has not allowed these relationships [to interfere] with my relationship with [BMH]." CP at 21. He further stated that after LH's 2008 divorce, she had "started relationships and moved several different men in and out of her home in Vancouver. These relationships have been confusing and disruptive to [BMH]." CP at 22.

¶11 MH submitted two other declarations with his peti-tion. In the declarations, a co-worker and his former wife described him as a dedicated father. MH's former wife also stated:

Over the years I've watched as [LH] has attempted to bring other boyfriends, of often transitory and short-term relation-ships, into [BMH's] life. On some of those occasions, [LH] has tried to limit [MH's] involvement with BMH for short periods of

time when she has a new boyfriend and wants him to be involved in [BMH's] life.

CP at 30.

¶12 On March 19, at MH's request, the trial court appointed a GAL "to investigate and report [on] [a]ll issues related to the development of a parenting plan." CP at 102. The trial court ordered LH to keep BMH in his Vancouver school pending the GAL's report. The trial court also ordered LH to continue to allow MH to have residential time with BMH from Thursday through Sunday on alternating weekends and one overnight during the weeks without weekend visitation.

## II. DE FACTO PARENTAGE ACTION

¶13 On March 24, after a hearing, the trial court entered an order finding that MH had established "a prima facie case for de facto parentage." CP at 222. LH moved for revision. On April 1, before the revision hearing, our Supreme Court issued *M.F.* After two hearings in which the parties debated *M.F.*'s impact on MH's de facto parentage action, the trial court granted LH's revision motion. The trial court dismissed MH's de facto parentage action and entered, in relevant part, the following findings of fact and conclusions of law:

> [Finding of fact 10(a):] The de facto parent action . . . has been recently further explained by the Supreme Court and is no longer, in this court's view, available to [MH] as a matter of law because he is a former stepparent and because he has petitioned for nonparental custody.
>
> [Finding of fact 10(b):] **M.F.** . . . excludes [MH from asserting a de facto parent cause of action] based on his former marriage to [LH] and on the filing of a nonparental custody action.
>
> [Conclusion of law 4:] [MH's] de facto parent action is barred as a matter of law under **L.B.**[4] and **M.F.** because [MH] has a potential statutory remedy to continue his relationship with

---

[4] *In re Parentage of L.B.*, 155 Wn.2d 679, 122 P.3d 161 (2005).

the child under RCW 26.10; and at the time of the parties['] dissolution, and subsequently, [MH] could have sought visitation under [RCW] 26.09.240 prior to it being struck down prospectively in, **Marriage of Anderson**, [134 Wn. App. 506, 141 P.3d 80 (2006)].[5]

[Conclusion of law 5]: The [court's] determination that [MH] cannot be a de facto parent is not based solely on the fact that he was a stepparent; it is also based upon the fact that he has had other statutory remedies. In addition our higher courts have on a number of occasions stated that a fit custodial parent has a fundamental constitutional right to make decisions concerning the rearing of his or her own children and a standard of best interest of the child is insufficient to serve as a compelling state interest overruling a parent's rights.

CP at 299-300, 302-03.

## III. GAL REPORT

¶14 On May 19, the GAL submitted a report stating that BMH viewed MH as a father and that it would be detrimental for BMH to terminate contact with MH. The GAL noted that because the case involved complex legal issues, appointment of counsel to represent BMH might be appropriate.

## IV. NONPARENTAL CUSTODY ACTION

¶15 Before the adequate cause hearing on the nonparental custody action, MH submitted two more declarations—one by his mother and one by LH's father—stating that BMH viewed MH as his father. MH's mother also alleged that BMH might be "damage[d]" if the trial court did not "protect the father/son relationship." CP at 139. LH's father stated that LH's choices were "detrimental to the boys." CP at 133. He also expressed concerns that LH and her boyfriend were trying to get BMH to view the boyfriend as a father.

---

[5] In 2005, our Supreme Court held that the nonparental visitation statute, RCW 26.09.240, was unconstitutional in its entirety because it violated the Fourteenth Amendment's due process clause. *In re Parentage of C.A.M.A.*, 154 Wn.2d 52, 57, 66, 69, 109 P.3d 405 (2005). In *Anderson*, we held that *C.A.M.A.* applied only prospectively. 134 Wn. App. at 512.

¶16 At the adequate cause hearing, MH informed the trial court that he did not challenge LH's fitness as a parent. Rather, he argued that "removing [MH] from [BMH's] life as his father" would be detrimental to BMH's growth and development. Report of Proceedings (RP) (July 15, 2008) at 218, 221. Specifically, he observed that on some past occasions when LH had initiated a relationship with a new boyfriend, "she's tried to limit [MH]'s . . . involvement with [BMH] for short periods of time." RP (July 15, 2008) at 224.

¶17 On August 20, the trial court found that adequate cause existed to proceed to a show cause hearing. The adequate cause finding reads in its entirety:

> Adequate cause for hearing the petition has been established by Court Order after a hearing.
>
> The Guardian Ad Litem has testified that it is in the child's best interest to have a continued relationship with the petitioner, [MH]. Based upon all of the affidavits, declarations and guardian ad [l]item report, the Court believes there is enough documentation set forth to proceed to trial on the non parental custody petition. The Court finds that if the Respondent/ mother denies contact between Petitioner and minor child it would cause actual detriment to the minor child's growth and development if the relationship between the minor child and the Petitioner is not protected, and the Court has concerns that the mother may withhold the visitation contact in the future.

CP at 142. At MH's request, the trial court appointed an expert to determine "whether actual detriment would result in the termination of the relationship between [MH] and [BMH]." CP at 145. The trial court also entered a detailed visitation order on August 20, granting MH residential time with BMH on the same schedule as his residential time with CH.

¶18 LH moved for discretionary review of the trial court's adequate cause finding under RAP 2.3(b)(2).[6] After receiving CR 54(b) certification from the trial court, MH appealed the trial court's dismissal of his de facto parentage action. We granted discretionary review of the trial court's adequate cause finding and consolidated review with MH's de facto parentage appeal.

## ANALYSIS

### I. DE FACTO PARENTAGE

¶19 MH first assigns error to the trial court's dismissal of his de facto parentage action. To determine whether dismissal was proper, we must interpret our Supreme Court's recent holding in *M.F.*, a case that, like this one, involves a de facto parent claim by a former stepparent. LH argues that *M.F.* precludes *any* former stepparent from acquiring de facto parent status over his or her former stepchild. MH urges a narrower reading, arguing that *M.F.* precludes a former stepparent from acquiring de facto parent status over his or her former stepchild only when that former stepchild has "two living legal parents." Resp't's Br. at 37. Because, in our opinion, *M.F.* does not preclude MH from acquiring de facto parent status over BMH, we reverse the trial court's dismissal of his de facto parentage action.

### A. Standard of Review

■ ¶20 Whether a former stepparent may acquire de facto parent status over his or her former stepchild is a question of law that we review de novo. *See M.F.*, 168 Wn.2d at 531.

---

[6] In her discretionary review motion, LH also asked us to stay enforcement of the trial court's August 20 visitation order pending resolution of the nonparental custody action. We denied the motion.

B. De Facto Parentage in *L.B.* and *M.F.*

¶21 In 2005, our Supreme Court created de facto parentage as a common law remedy in parentage actions. *See L.B.*, 155 Wn.2d at 707-08. In *L.B.*, two women who had lived together in a long-term relationship decided to have a child. 155 Wn.2d at 682. One of the women conceived using donor sperm. *L.B.*, 155 Wn.2d at 682. After the child's birth, the women co-parented the child until they ended their relationship when the child was six years old. *L.B.*, 155 Wn.2d at 682, 684. The biological mother eventually terminated all contact between her former partner and the child. *L.B.*, 155 Wn.2d at 684-85. The former partner petitioned, in relevant part, for recognition as the child's de facto parent. *L.B.*, 155 Wn.2d at 685.

¶22 The *L.B.* court held that the common law granted the former partner standing to bring a parentage action to prove that she was a de facto parent. 155 Wn.2d at 707. The court observed that the legislature had not enacted statutes governing the rights and responsibilities of adults in parenting arrangements involving children conceived from artificial insemination. *L.B.*, 155 Wn.2d at 694 n.9. But the court explained that "Washington common law recognizes the significance of parent-child relationships that may otherwise lack statutory recognition." *L.B.*, 155 Wn.2d at 693 (citing *In re Custody of Stell*, 56 Wn. App. 356, 783 P.2d 615 (1989); *In re Marriage of Allen*, 28 Wn. App. 637, 626 P.2d 16 (1981)). The court analyzed the Washington Uniform Parentage Act (UPA), chapter 26.26 RCW, and concluded that the legislature, by enacting the UPA and related statutes, did not intend "to supplant the common law equity powers of our trial courts with regard to parentage, visitation, child custody, and support." *L.B.*, 155 Wn.2d at 701. Accordingly, the court exercised its common law powers to recognize the equitable remedy of de facto parentage. *L.B.*, 155 Wn.2d at 707.

¶23 The court adopted a four-part test for establishing de facto parentage:

(1) the natural or legal parent consented to and fostered the parent-like relationship, (2) the petitioner and the child lived together in the same household, (3) the petitioner assumed obligations of parenthood without expectation of financial compensation, and (4) the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship, parental in nature.[7]

*L.B.*, 155 Wn.2d at 708. The court stated that an individual who meets this test "stands in legal parity with an otherwise legal parent, whether biological, adoptive, or otherwise." *L.B.*, 155 Wn.2d at 708. The court remanded to the trial court for a determination of whether the former partner was a de facto parent. *L.B.*, 155 Wn.2d at 707, 715.

¶24 In *M.F.*, our Supreme Court examined "whether the common law de facto parentage doctrine, recognized in [*L.B.*], extends to a stepparent/stepchild relationship." 168 Wn.2d at 529. There, a former stepparent petitioned to be recognized as the de facto parent of his former stepdaughter. *M.F.*, 168 Wn.2d at 530. At the time, his former stepdaughter's biological parents shared parenting rights and responsibilities under a parenting plan. *M.F.*, 168 Wn.2d at 529-30.

¶25 The *M.F.* court held that de facto parent status was not available to the former stepfather. 168 Wn.2d at 535. The court distinguished the former stepfather's position from that of the former partner in *L.B.*:

> The legislature did envision the circumstances before us in this case. The statutory void confronting us in *L.B.* is absent here. As did the parties in *L.B.*, [the biological parents here] chose to have children and form a family. But unlike in *L.B.*, [the biological parents'] status as legal parents was established at the outset. In contrast, [the former stepfather] entered M.F.'s life as a stepparent, a third party to M.F.'s two existing parents.

---

[7] The *L.B.* court also observed that de facto parent status is " 'limited to those adults who have fully and completely undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life.' " 155 Wn.2d at 708 (quoting *C.E.W. v. D.E.W.*, 2004 Me. 43, 845 A.2d 1146, 1152 (2004)).

When [the former stepfather] entered her life, M.F.'s legal parents and their respective roles were already established under our statutory scheme. In the case before us, we perceive no statutory void and cannot apply an equitable remedy that infringes upon the rights and duties of M.F.'s existing parents.

*M.F.*, 168 Wn.2d at 532.

¶26 The *M.F.* court rejected the former stepfather's argument that recognition of his de facto parent status would not infringe on the parental rights of the child's existing parents. 168 Wn.2d at 532. The court noted that *L.B.* involved the " 'competing interests of *two parents*' "—the biological mother and a de facto parent—who stood in " 'equivalent parental positions.' " *M.F.*, 168 Wn.2d at 532 (quoting *L.B.*, 155 Wn.2d at 710). In contrast, the situation in *M.F.* involved "the competing interests of parents—with established parental rights and duties—and a stepparent, a third party who has no parental rights." *M.F.*, 168 Wn.2d at 532. Stepparents already had an avenue for "seeking a legal, custodial relationship with a child" because the legislature had enacted chapter 26.10 RCW to address issues of nonparental custody. *M.F.*, 168 Wn.2d at 532. Thus, according to the court, "[t]he legislature has provided a statutory remedy for a stepparent seeking a custodial relationship with a stepchild by enabling stepparents to petition for custody." *M.F.*, 168 Wn.2d at 533. The court then reiterated the difference between the former stepfather in *M.F.* and the former partner in *L.B.*:

[H]ere, the [former stepfather] is a third party to the two already existing parents, which places him in a very different position than the [former partner] in *L.B.* These differences, as well as the presence of a statutory remedy available to [the former stepfather], support our conclusion that the de facto parentage doctrine should not extend to the circumstances in this case.

*M.F.*, 168 Wn.2d at 534.

¶27 Finally, the court observed that de facto parentage could not be applied "in the stepparent context . . . in a

374

meaningful way." *M.F.*, 168 Wn.2d at 534. To illustrate the poor fit between de facto parentage and "the stepparent context," the court applied *L.B.*'s four-part test to a hypothetical stepparent and concluded:

> The elements of the test are ill-suited to determinations in the stepparent context because in most cases they will be very easily satisfied. . . . The only variable in most cases, it would appear, is the length of time the stepparent has been in a parental role, and generally this would be merely a matter of how long the relationship with the parent endures—hardly a basis for deciding parental status.

*M.F.*, 168 Wn.2d at 534-35. The court concluded its opinion by stating, "Because no statutory void exists in this case, as it did in *L.B.*, we decline to extend the de facto parentage doctrine to the facts presented." *M.F.*, 168 Wn.2d at 535.

### C. MH Can Be a De Facto Parent

¶28 Like the parties and the trial court, we recognize that *M.F.* is subject to two competing interpretations. The issue statement at the beginning of the opinion[8] and the application of *L.B.*'s four-part test to a hypothetical stepparent at the end of the opinion suggest a broad holding that a stepparent or former stepparent can never be a de facto parent. *See M.F.*, 168 Wn.2d at 529, 534-35. But the two issue statements at the beginning of the analysis section[9] and the manner in which the court distinguished *L.B.* suggest a narrower holding—namely, that stepparents and former stepparents are precluded from being de facto

---

[8] This issue statement reads, "This case asks us to decide whether the common law de facto parentage doctrine, recognized in [*L.B.*], extends to a *stepparent/ stepchild* relationship." *M.F.*, 168 Wn.2d at 529 (emphasis added).

[9] These issue statements read:

> This case comes before us on a CR 12(b)(6) motion to dismiss presenting only a question of law—whether a stepparent may acquire de facto parent status *when the child has two fit parents.* . . . This case requires us to examine our holding in *L.B.* and decide whether the doctrine of de facto parentage *should extend to the facts before us in this case.*

*M.F.*, 168 Wn.2d at 531 (emphasis added).

parents only when the child has two existing, fit parents. *See M.F.*, 168 Wn.2d at 531-32, 534.

¶29 We read *M.F.* narrowly because the court's analysis focused primarily on the specific factual and legal differences between the situation in *L.B.* and the situation in the case before it. *See* 168 Wn.2d at 531-35. At the beginning of its analysis, the *M.F.* court explained that it "found it necessary to fashion a common law remedy" of de facto parentage in *L.B.* because "no statutory means existed by which the [biological mother's former partner] could establish her parental status." 168 Wn.2d at 531. The court observed that the former stepfather in the case before it—unlike the former partner in *L.B.*—"entered [the child's] life as a stepparent, a third party to [the child's] two existing parents." *M.F.*, 168 Wn.2d at 532. Thus, when the former stepfather entered the child's life, the respective parental roles of the two existing parents "were already established under our statutory scheme." *M.F.*, 168 Wn.2d at 532. Because the existing parents' roles were established "at the outset," the court observed that the statutory void that was present in *L.B.* was not present in the case before it. *M.F.*, 168 Wn.2d at 532. By focusing on the factual and legal distinctions between the case before it and *L.B.*, we believe that the *M.F.* court intended to announce a narrow rule limited only to similar stepparent situations, not a sweeping rule applicable to all stepparents and former stepparents.

¶30 Our narrow reading of *M.F.* leads us to conclude that *M.F.* precludes stepparents and former stepparents from acquiring de facto parent status only when the child has two existing, fit parents. Here, BMH—unlike the child in *M.F.*—had only one living biological parent[10] (LH) when the individual seeking de facto parent status (MH) entered his

---

[10] We believe that the *M.F.* court was referring to living parents when it discussed "existing" parents. *See* 168 Wn.2d at 532, 534. Accordingly, although BMH receives financial benefits as a dependent of his biological father and is considered his biological father's "surviving issue" for purposes of the Washington

life. Accordingly, in our view, *M.F.* does not preclude MH from asserting a de facto parentage claim.

¶31 LH asserts that MH cannot be a de facto parent because he had three statutory remedies available to him "to establish a legal relationship with [BMH]": (1) nonparental custody under chapter 26.10 RCW; (2) nonparental visitation under RCW 26.09.240, *invalidated by In re Parentage of C.A.M.A.*, 154 Wn.2d 52, 66, 69, 109 P.3d 405 (2005); and (3) adoption. We disagree that the potential availability of these remedies precludes MH from asserting a de facto parentage claim.

¶32 First, with regard to the remedy of nonparental custody, we note that unlike a de facto parent who "stands in legal parity with an otherwise legal parent," *L.B.*, 155 Wn.2d at 708, an individual who acquires nonparental custody over a child does not acquire the same legal rights as a parent. As Division One of this court has aptly explained:

> [R]esidential placement is not equivalent to parental status. The nonparent custody statute and the de facto parent doctrine have very different purposes. A nonparent custody order confers only a temporary and uncertain right to custody of the child for the present time because the child has no suitable legal parent. When and if a legal parent becomes fit to care for the child, the nonparent has no right to continue a relationship with the child.
>
> Parenthood comprises much more than mere custody. A parent has a fundamental liberty interest in the care, custody, and control of his or her child. One who meets the rigorous test that defines a "de facto parent" stands in legal parity to an otherwise legal parent, and therefore is vested with the same parental rights and responsibilities, limited only by the best interests of the child. The nonparent custody statute cannot provide an adequate remedy to one who meets the stringent de facto parent criteria.

---

Trust Act, ch. 11.98 RCW, these facts do not preclude MH from acquiring de facto parent status. *See* Appellant's Reply Br. at 18 (quoting RCW 11.02.005(4)).

*In re Parentage of J.A.B.*, 146 Wn. App. 417, 426, 191 P.3d 71 (2008) (footnotes omitted).

¶33 We recognize, however, that the *M.F.* court characterized a nonparent's ability to establish a "custodial relationship" through the nonparental custody statute as a potential remedy that may prevent the nonparent from acquiring de facto parent status:

> Though our statutory scheme does not permit a stepparent to petition for parental status, this does not equate to a lack of remedy. The legislature has provided a statutory remedy for a stepparent seeking a custodial relationship with a stepchild by enabling stepparents to petition for custody.

*M.F.*, 168 Wn.2d at 533. We do not read this language to mean that a nonparent's ability to file a petition under RCW 26.10.030(1) to seek custody of a child automatically precludes that nonparent from seeking and acquiring de facto parent status. Indeed, reading *M.F.* this broadly would seem to eliminate the de facto parent doctrine altogether because any "person other than a parent"[11] may seek custody of the child under RCW 26.10.030(1).[12]

¶34 Moreover, the *M.F.* court's analysis focused primarily on the fact that the child had two existing parents:

> [H]ere, the [former stepfather] is a third party to the two already existing parents, which places him in a very different

---

[11] A "person other than a parent" can file a nonparental custody petition asserting that the child is not in the physical custody of a parent or that neither parent is a suitable custodian. RCW 26.10.030(1).

[12] We note that in *M.F.*, there were no allegations that either of the biological parents was unfit. 168 Wn.2d at 530. Nor does it appear from the facts of that case that a nonparent ever had physical custody of MF. *See M.F.*, 168 Wn.2d at 530. Accordingly, the *M.F.* court observed that the stepfather in that case had a "statutory remedy for . . . seeking a custodial relationship" even though he would have been unable to make either of RCW 26.10.030(1)'s threshold allegations. *M.F.*, 168 Wn.2d at 533. *But see In re Parentage & Custody of A.F.J.*, 161 Wn. App. 803, 816-17, 824, 260 P.3d 889 (affirming trial court's determining that foster parent was de facto parent and concluding that nonparental custody was not an available statutory remedy where the trial court had rejected the foster parent's nonparental custody petition after determining that the biological mother was a fit parent), *review granted*, 172 Wn.2d 1017 (2011).

position than the [former partner] in *L.B.* These differences, *as well as the presence of a statutory remedy available to [the former stepfather]*, support our conclusion that the de facto parentage doctrine should not extend to the circumstances in this case.

168 Wn.2d at 534 (emphasis added). The italicized language suggests that although the existence of the statutory remedy of nonparental custody may be a factor in determining whether the de facto parentage doctrine applies in a given case, it is not the determinative factor. Indeed, in *L.B.*, the former partner's ability[13] to file a nonparental custody petition did not prevent her from asserting a de facto parent claim. *See In re Parentage & Custody of A.F.J.*, 161 Wn. App. 803, 817 n.7, 260 P.3d 889, *review granted*, 172 Wn.2d 1017 (2011). In the case before us, because BMH does not have two existing parents, we conclude that the availability of the statutory remedy of nonparental custody does not preclude MH's de facto parent action.

¶35 Second, LH asserts that MH has a statutory remedy because he could have petitioned for nonparental visitation under RCW 26.09.240 after LH and MH divorced in 2001, which is four years before our Supreme Court held that this statute was unconstitutional in its entirety. *See C.A.M.A.*, 154 Wn.2d at 69; *see also Anderson*, 134 Wn. App. at 512 (holding that *C.A.M.A* applied prospectively). This argument is misplaced. RCW 26.09.240 provided a remedy for a nonparent seeking visitation, but it did not provide a remedy for a nonparent "seeking a custodial relationship" or parental status with a child. *M.F.*, 168 Wn.2d at 533. Accordingly, the potential availability of this remedy after MH's and LH's divorce did not preclude MH's de facto parentage action.

¶36 Finally, we address LH's claim that the availability of adoption precluded MH from maintaining a de facto

---

[13] The *L.B.* court did not discuss what impact, if any, the former partner's ability to file a nonparental custody petition had on her de facto parentage claim.

parentage claim. We begin by noting that neither *L.B.* nor *M.F.* discuss how adoption impacts a petitioner's ability to assert a de facto parent claim. The only published opinion to address adoption as a potential statutory remedy appears to be a recent Division One decision. *See A.F.J.*, 161 Wn. App. at 816-17. There, the court determined that because the child's foster parent, who had raised the child since birth, had only two months to complete an adoption under the unique circumstances of that case, adoption was not an available statutory remedy that precluded her from asserting a de facto parent claim. *A.F.J.*, 161 Wn. App. at 816-17.

¶37 MH's ability to adopt BMH also did not preclude him from maintaining a de facto parentage action. First, we note that even though adoption was an available statutory option to the former partner in *L.B.*, the court held that the former partner "should have the opportunity to present evidence to the court sufficient to establish her status as a *de facto* parent." 155 Wn.2d at 683. Second, as in *A.F.J.*, there are facts in the record suggesting that adoption was not feasible in this case. Specifically, according to the GAL, MH and LH elected not to pursue adoption because of the potential impact that adoption would have on BMH's survivor benefits.

¶38 We conclude by observing that the common law remedy of de facto parentage is necessary "to fill the interstices that our current legislative enactment fails to cover in a manner consistent with our laws and stated legislative policy." *L.B.*, 155 Wn.2d at 707. As the *L.B.* court explained:

> Our state's current statutory scheme reflects the unsurprising fact that statutes often fail to contemplate all potential scenarios which may arise in the ever changing and evolving notion of familial relationships. Yet, simply because a statute fails to speak to a specific situation should not, and does not in our common law system, operate to preclude the availability of potential redress. This is especially true when the rights and interests of those least able to speak for themselves are concerned.

155 Wn.2d at 706-07. The instant case, like *L.B.*, strikes us as a scenario that current statutes fail to address. It forces us to decide whether a child may be deprived of the care and protection of an individual who functions[14] as one of the child's two parents where one of the child's natural parents has died and can no longer care for and protect the child. Because no statute or case speaks to this situation, trial courts should resolve such situations on a case-by-case basis by applying *L.B.*'s de facto parentage test.[15]

¶39 In sum, we hold that where, as here, a child has only one existing parent when a former stepparent enters the child's life, the former stepparent may assert a de facto parentage claim. Accordingly, we reverse the trial court's findings and conclusions that MH cannot be a de facto parent as a matter of law because (1) he is a former stepparent, (2) he filed a nonparental custody petition, (3) he could have petitioned for nonparental visitation under RCW 26.09.240 before our Supreme Court held that statute to be unconstitutional, and (4) he had other statutory remedies. We remand for a hearing to determine whether MH is BMH's de facto parent.

## II. NONPARENTAL CUSTODY

¶40 LH argues that the trial court erred by entering a finding of adequate cause with regard to MH's nonparental custody petition. Specifically, she contends that the trial court impermissibly based its adequate cause finding on speculation that she "might terminate contact" between

---

[14] This turn of phrase assumes that MH is BMH's de facto parent, a question on which we take no position and that must be determined by the trial court on remand.

[15] Like the *L.B.* court, we recognize that although this type of litigation tends to focus on the interests, rights, and responsibilities of the litigant adults, " 'the best interests of the child' pervades our judicial consciousness in this field." 155 Wn.2d at 694 n.10. This standard requires courts to "remain centrally focused on those whose interests with which we are concerned, recognizing that not only are they often the most vulnerable, but also powerless and voiceless." 155 Wn.2d at 712 n.29. Thus, the value to BMH of two parents rather than one is an issue that the trial court may consider on remand.

MH and BMH at some undetermined time in the future. We disagree.

## A. Standard of Review

¶41 A trial court's determination of whether a nonparent has demonstrated adequate cause to proceed to a show cause hearing under RCW 26.10.032(2) is a mixed question of law and fact that we review de novo. *See In re Custody of S.C.D.-L.*, 170 Wn.2d 513, 516-17, 243 P.3d 918 (2010) (applying facts in nonparental custody petition to statutory standards and concluding that the trial court erred by finding adequate cause to proceed to a hearing); *accord Grieco v. Wilson*, 144 Wn. App. 865, 875, 184 P.3d 668 (2008) (review of adequate cause finding is de novo where the trial court's order involves interpretation of statutory requirements).

## B. MH Demonstrated Adequate Cause

¶42 MH does not dispute that LH is a fit parent. The State may interfere with a fit parent's fundamental liberty interest in the care, custody, and control of her children only when the State's interference is narrowly tailored to meet a compelling state interest. *In re Custody of Shields*, 157 Wn.2d 126, 144, 136 P.3d 117 (2006); *see also Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). Thus, in a nonparent custody action, a court may interfere with a fit parent's decision to maintain custody of her child only if the nonparent demonstrates that placement of the child with the fit parent will result in "actual detriment to the child's growth and development." *Shields*, 157 Wn.2d at 144. A showing of "actual detriment" requires a substantial showing that the nonparent will generally be able to make only in " 'extraordinary circumstances.' " *Shields*, 157 Wn.2d at 145 (quoting *Allen*, 28 Wn. App. at 649).

¶43 When a nonparent files a petition seeking custody of a child, a trial court must make a threshold

determination of "adequate cause" before allowing a show cause hearing on the petition:

(1) A party seeking a custody order shall submit, along with his or her motion, an affidavit declaring that the child is not in the physical custody of one of its parents or that neither parent is a suitable custodian *and setting forth facts supporting the requested order.* The party seeking custody shall give notice, along with a copy of the affidavit, to other parties to the proceedings, who may file opposing affidavits.

(2) The court *shall deny the motion unless it finds that adequate cause for hearing the motion is established by the affidavits,* in which case it shall set a date for hearing on an order to show cause why the requested order should not be granted.

RCW 26.10.032. This statute requires the nonparent to set forth facts showing that the trial court should grant custody to the nonparent because the parent is unfit or because placement with the parent would result in actual detriment to the child's growth and development. *In re Custody of E.A.T.W.*, 168 Wn.2d 335, 344, 227 P.3d 1284 (2010) (citing *Shields*, 157 Wn.2d at 142-43). The primary purpose of this threshold requirement is to prevent a useless hearing. *E.A.T.W.*, 168 Wn.2d at 348.

¶44 We agree with the trial court that MH met his burden of production under RCW 26.10.032(1) by setting forth facts showing that the trial court should grant custody of BMH to him because placement of BMH with LH would result in actual detriment to BMH's growth and development. *See E.A.T.W.*, 168 Wn.2d at 344. Specifically, MH's petition and declarations stated that (1) BMH viewed MH as his father, and the two had a close relationship; (2) LH was threatening to move BMH out of the area and thus disrupt this close relationship; (3) LH had occasionally "tried to limit" his contact with BMH when she was involved in relationships with other men, including during her 2007-08 marriage; (4) LH had once told MH that he could not see BMH; and (5) LH had "moved several different

men in and out of her home in Vancouver," which has been "confusing and disruptive" to BMH. CP at 20-22. The GAL emphasized that BMH viewed MH as a father and that it would be detrimental to BMH if LH terminated his contact with MH.[16] Taken together, we believe that these facts support a finding of adequate cause, entitling MH to a show cause hearing.[17] Accordingly, we affirm the trial court's finding.

III. Legal Representation

¶45 MH assigns error to the trial court's denial of legal representation to BMH. He argues that because BMH "has a compelling interest in preserving those relationships that embody his family," the trial court should have joined BMH as a necessary party and appointed counsel to represent him. Resp't's Br. at 46. We decline to address this issue.

■ ¶46 Here, neither parent requested appointed counsel for BMH at any stage of the proceedings. The GAL broached this issue only in passing, noting that it might be appropriate for the trial court to appoint counsel because the case involved complex legal issues. But the GAL did not affirmatively request counsel, nor did she argue that counsel was necessary or constitutionally required. This issue was not discussed at any of the hearings that have been transcribed for this appeal, and the record contains no evidence that the trial court considered or decided this issue. The only evidence that the trial court considered and decided this issue consists of the June 4, 2010, clerk's notes filed under a different cause number, which MH attached to his brief but which are not part of the record on review. *See* RAP 9.1. Because this issue was not properly raised at the

---

[16] We believe that it is appropriate to consider the GAL's report in determining whether MH met his burden of production. *See* RCW 26.10.032(2) (a trial court must deny a nonparental custody motion "unless it finds that adequate cause for hearing the motion *is established by the affidavits*" (emphasis added)).

[17] We take no position on MH's ability to meet the "actual detriment" standard at the show cause hearing.

trial level, we decline to reach it. *See L.B.*, 155 Wn.2d at 712 n.29 (declining to decide whether the constitution mandated the appointment of counsel in a custody action where no party to the dispute, including the child through her GAL, "raised or otherwise addressed this issue at any stage in the proceeding").

IV. ATTORNEY FEES

¶47 Both parties request attorney fees and costs on appeal under RCW 26.10.080, which states, in relevant part:

> Upon any appeal, the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorney's fees in addition to statutory costs.

When deciding whether to award attorney fees under this statute, we must balance the needs of the party requesting fees against the other parties' ability to pay. *In re Custody of Brown*, 153 Wn.2d 646, 656, 105 P.3d 991 (2005). Here, because LH and MH each sought review of a legal issue before us, each party should bear its own costs and attorney fees.

¶48 We affirm the trial court's adequate cause finding, reverse the dismissal of MH's de facto parentage action, and remand for a show cause hearing on the nonparental custody action and a hearing to determine whether MH is BMH's de facto parent.

HUNT and QUINN-BRINTNALL, JJ., concur.

Review granted at 173 Wn.2d 1031 (2012).